# EXHIBIT A

FILED
07-20-2022
CIRCUIT COURT
DANE COUNTY, WI
2022CV001795
Honorable Nia Trammell
Branch 6

**STATE OF WISCONSIN     CIRCUIT COURT     DANE COUNTY**
**BRANCH _____**

---

STATE OF WISCONSIN
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857

        Plaintiff,

      v.

3M COMPANY
3M Center
St. Paul, Minnesota 55144

E.I. DU PONT DE NEMOURS AND
COMPANY
974 Centre Road
Wilmington, Delaware 19805

DUPONT DE NEMOURS, INC.
974 Centre Road
Wilmington, Delaware 19805

THE CHEMOURS COMPANY
1007 Market Street
Wilmington, Delaware 19899

THE CHEMOURS COMPANY FC, LLC
1007 Market Street
Wilmington, Delaware 19899

BUCKEYE FIRE EQUIPMENT CO.
110 Kings Road,
Kings Mountain, North Carolina 28086

TYCO FIRE PRODUCTS, LP
2700 Industrial Parkway South
Marinette, Wisconsin 54143

Case No. 2022-CV-_____
Civil Unclassified: 30703

THE AMOUNT CLAIMED IS
GREATER THAN THE AMOUNT
CLAIMED UNDER
WIS. STAT. § 799.01(1)(d)

---

IF YOU REQUIRE THE ASSISTANCE OF AUXILIARY AIDS OR SERVICES BECAUSE OF A DISABILITY, CALL (608) 266-4678
(TTY -- (608) 266-4625) AND ASK FOR THE DANE COUNTY CIRCUIT COURT ADA COORDINATOR.

KIDDE-FENWAL, INC.
400 Main Street
Ashland, Massachusetts 01721

NATIONAL FOAM, INC.
350 E Union Street,
West Chester, Pennsylvania 19382

CHEMGUARD, INC.
One Stanton Street
Marinette, Wisconsin 54143

AMEREX CORPORATION
7595 Gadsden Highway
Trussville, Alabama 35173

CHEMDESIGN PRODUCTS, INC.
Two Stanton Street
Marinette, Wisconsin 54143

BASF CORPORATION
100 Park Avenue
Florham Park, New Jersey 07932

DYNAX CORPORATION
103 Fairview Park Drive
Elmsford, New York 10523

ARCHROMA U.S., INC.
5445 77 Center Drive
Charlotte, North Carolina 28217

CARRIER GLOBAL CORPORATION
13995 Pasteur Boulevard
Palm Beach Gardens, Florida 33418

UTC FIRE & SECURITY AMERICAS
CORPORATION, INC.
9 Farm Springs Road
Farmington, Connecticut 06032

CLARIANT CORPORATION
4900 Crittenden Drive
Louisville, Kentucky 40209

JOHN DOE DEFENDANTS 1-20

      Defendants.

---

# COMPLAINT

---

     The State of Wisconsin, by its attorneys, Attorney General Joshua L. Kaul and Assistant Attorneys General R. Duane Harlow, Bradley J. Motl, and Sarah C. Geers, files this Complaint pursuant to Wis. Stat. §§ 14.11 and 823.02 against Defendants 3M Company (a/k/a Minnesota Mining and Manufacturing Company); E. I. du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; DuPont de Nemours, Inc.; Buckeye Fire Equipment Company, Kidde-Fenwal, Inc.; National Foam, Inc.; Tyco Fire Products, LP; Chemguard, Inc.; Amerex Corporation; ChemDesign Products, Inc.; BASF Corporation; Dynax Corporation; Archroma U.S., Inc.; Carrier Global Corporation, UTC Fire & Security Americas Corporation, Inc., Clariant Corporation, and Doe Defendants 1-20 (collectively, "Defendants"). The State alleges as follows:

1

# INTRODUCTION

1.     The State brings this action against Defendants for widespread contamination of Wisconsin's property and natural resources with toxic per- and poly-fluoroalkyl substances ("PFAS").

2.     PFAS are a class of synthetic chemicals that do not occur naturally in the environment and have been in use since the 1940s.

3.     PFAS are commonly referred to as "forever" chemicals because they are nearly indestructible, taking hundreds—or even thousands—of years to degrade naturally in the environment.[1]

4.     PFAS are also toxic at extremely low levels—i.e., in the parts per trillion. Exposure to these human-made chemicals has been linked to a wide array of adverse human health effects, including cancer, and is considered particularly dangerous to pregnant women and young children.

5.     Defendants in this action are major chemical companies that designed, manufactured, marketed, promoted, sold, supplied, distributed, used, and/or disposed of PFAS, products containing PFAS, and/or products that degrade into PFAS after release to the environment (collectively, "PFAS Products"), including but not limited to aqueous film-forming foam ("AFFF").

---

[1] Annie Sneed, *Forever chemicals are widespread in U.S. drinking water: Experts hope that with the incoming Biden administration, the federal government will finally regulate a class of chemicals known as PFAS,* Scientific American (Jan. 22, 2021, *republished* Oct. 8, 2021), https://www.scientificamerican.com/article/forever-chemicals-are-widespread-in-u-s-drinking-water/.

6. For decades, Defendants knew or should have known that PFAS are highly soluble in water; extremely mobile; persistent; and very likely to contaminate surface water and groundwater, including drinking water supplies, in the State of Wisconsin. Defendants also knew or should have known that PFAS present significant risks to human health and welfare if released to the environment. Nonetheless, they continued manufacturing, distributing, and selling huge volumes of PFAS Products to industrial facilities and consumers in Wisconsin, knowing full well that the ordinary use and disposal of those products would result in widespread PFAS contamination of the State's natural resources and property.

7. Moreover, rather than warning of these risks and harms, Defendants concealed the dangers of PFAS from consumers, the public, and the State. Even as their own research showed that the normal use and disposal of PFAS Products would contaminate the environment and endanger public health, Defendants publicly denied, downplayed, and distorted the risks posed by PFAS.

8. By selling in and sending PFAS Products into Wisconsin while simultaneously concealing and misrepresenting the severe human health and environmental risks posed by those products, Defendants caused widespread contamination that has injured—and continues to injure—the public health,

natural resources, property, and economic well-being of the State and its citizens.

9.      The ubiquitous contamination and injury caused by PFAS Products in Wisconsin has only recently been discovered through diligent and extensive investigation by the State. In 2019, Governor Anthony Evers issued Executive Order No. 40, which directed the Wisconsin Department of Natural Resources ("DNR") to organize and lead a council in coordinating the State's investigation of and response to PFAS risks.[2] The resulting Wisconsin PFAS Action Council ("WisPAC") included designees from twenty state agencies and the University of Wisconsin system.[3]

10.     As a result of these ongoing investigatory efforts, the State has discovered dangerous levels of PFAS in groundwater, air, sediment, surface water, and drinking water throughout Wisconsin. PFAS have been found across the state in municipalities like La Crosse, Marinette, Peshtigo, Milwaukee, Madison, Rhinelander, Wausau, West Bend, Adams, Marshfield, Weston, Mosinee, Rib Mountain and Eau Claire, among others. No corner of the State has been left untouched.

11.     To this day, the State continues to take necessary actions to protect its natural resources and its residents from harm caused by PFAS

---

[2] "Wisconsin PFAS Action Plan," Wisconsin PFAS Action Council, iv (Dec. 2020), *available at* https://widnr.widen.net/content/d4vyg9qqwj/pdf/EM_PFASActionPlan.pdf.
[3] *Id.*

4

contamination in accordance with the WisPAC Action Plan. This includes monitoring, abating, containing, preventing, treating, and removing PFAS from natural resources and property located throughout Wisconsin. It also involves efforts to educate the State's citizens, business community, and local governments about the dangers of PFAS as well as planning for and implementing public health efforts to respond to and manage the effects of PFAS Products' contamination on the State's citizens.

12.     The State and its taxpayers will need to spend billions of dollars remediating the dangerous PFAS contamination caused by Defendants' wrongful, deceptive, and tortious conduct.

13.     The State therefore files this lawsuit to ensure that those who profited from the production, promotion, and sale of PFAS Products also bear the costs stemming from the ordinary and foreseeable use of those products. The State asserts state-law claims for public and private nuisance, trespass, negligence, strict liability failure to warn, and strict liability design defect in its capacity as sovereign, as trustee of public resources, as an owner of property, and pursuant to its *parens patriae* authority. The State brings this litigation, which Governor Evers has authorized, pursuant to Wis. Stat. §§ 14.11, 165.25(1m), 823.01, and 823.02 and Wis. Const. art. VI, § 3.

14.     The State seeks to recover all costs, expenses, and damages associated with Defendants' tortious conduct, including—but not limited to—

restoration and loss-of-use damages, natural-resource damages, and the costs of investigating, abating, containing, preventing, treating, removing, and remediating PFAS contamination in Wisconsin. The State also requests punitive damages to reflect Defendants' reprehensible conduct.[4]

## PARTIES

15.    **Plaintiff the State of Wisconsin** is a sovereign state of the United States of America. It maintains its government at the State Capitol in the City of Madison, Wisconsin.

16.    **Defendant 3M Company** ("3M") is a Delaware corporation with its principal place of business in St. Paul, Minnesota. 3M conducts business at numerous locations throughout the United States and Wisconsin. Since 1964, 3M has operated manufacturing facilities in Wisconsin. For instance, 3M housed manufacturing operations in Prairie du Chien, Wisconsin. The facilities today comprise one plant covering approximately 535,000 square feet of manufacturing and warehouse space, located on 60 acres of land and employing approximately 550 people. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold PFAS Products throughout the United States, including in Wisconsin.

---

[4] In this Complaint, the State does not seek to recover any relief for PFAS contamination relating to the specific property located at 2700 Industrial Parkway South, Marinette, Wisconsin, which is the subject of an enforcement action filed by the State pursuant to Wis. Stat. ch. 292. *See State of Wisconsin v. Tyco Fire Products LP, et al.*; Marinette County Case No. 2022CX000001.

17.     **Defendant E.I. du Pont de Nemours and Company**
("Historical DuPont") is a Delaware corporation with its principal place of
business in Wilmington, Delaware. Historical DuPont manufactured,
marketed, promoted, distributed, and/or sold PFAS Products throughout the
United States, including in Wisconsin.[5]

18.     **Defendant The Chemours Company** is a Delaware
corporation with its principal place of business in Wilmington, Delaware. The
Chemours Company conducts business throughout the United States,
including in Wisconsin.

19.     The Chemours Company was incorporated as a wholly owned
subsidiary of Historical Dupont as of April 30, 2015. In July 2015, Historical
Dupont spun off The Chemours Company and transferred to The Chemours
Company its performance-chemicals business line, which includes its
fluoroproducts business. Historical Dupont also distributed shares of The
Chemours Company stock to Historical DuPont stockholders. Since then, The
Chemours Company has operated as an independent, publicly traded company.

20.     **Defendant The Chemours Company FC, LLC** is a Delaware
corporation with its principal place of business in Wilmington, Delaware. The

---

[5] The State reserves the right to join Corteva, Inc. ("Corteva"), a Delaware corporation with its
principal place of business in Wilmington, Delaware, to this complaint. Corteva is the direct parent of
Historical DuPont, and it may hold certain relevant assets and liabilities which are currently unknown
to the State but may relate to the misconduct described in this complaint. Corteva conducts business
throughout the United States, including in Wisconsin.

Chemours Company FC, LLC conducts business throughout the United States, including in Wisconsin.

21.     The Chemours Company FC, LLC operates as a subsidiary of The Chemours Company, and it manufactures fluoropolymer resins.

22.     This Complaint refers collectively to The Chemours Company and The Chemours Company FC, LLC as "Chemours."

23.     **Defendant DuPont de Nemours, Inc.** (f/k/a DowDuPont Inc.) ("New DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware.

24.     New DuPont conducts business throughout the United States, including in Wisconsin.

25.     On June 1, 2019, DowDuPont—the surviving entity after the spin-off of Corteva, Inc. and another entity known as Dow, Inc.—changed its name to DuPont de Nemours, Inc. (referred herein as "New DuPont"). Following the spin-off, New DuPont retained assets in the specialty products business lines, as well as the balance of the financial assets and liabilities of Historical DuPont that were not assumed by Corteva.

26.     This Complaint collectively refers to Historical DuPont, Chemours, and New DuPont as "DuPont."

27.     **Defendant Buckeye Fire Equipment Company** ("Buckeye") is an Ohio corporation with its principal place of business in Kings Mountain,

8

North Carolina. Buckeye Fire manufactured, marketed, promoted, and/or sold AFFF that contained PFAS, including in Wisconsin.

28. **Defendant Kidde-Fenwal, Inc.** ("Kidde") is a Delaware corporation with its principal place of business in Ashland, Massachusetts. Kidde is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.). Kidde manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS, including in Wisconsin.

29. **Defendant National Foam, Inc.,** also known as Chubb National Foam (collectively "National Foam"), is a Delaware corporation with its principal place of business in West Chester, Pennsylvania. National Foam manufactured, marketed, promoted, and/or sold AFFF that contained PFAS, including in Wisconsin.

30. **Defendant Tyco Fire Products, LP** ("Tyco") is a Delaware limited partnership with its principal place of business in Marinette, Wisconsin. Tyco is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul"). Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International plc, an Irish public limited company listed on the New York Stock Exchange. At all relevant times, Tyco and/or Ansul (collectively, "Tyco/Ansul") manufactured, marketed, promoted, and/or sold AFFF that contained PFAS, including in Wisconsin.

9

31.     **Defendant Chemguard Inc.** ("Chemguard") is a Texas corporation with its principal place of business in Marinette, Wisconsin. Like Tyco, Chemguard is a subsidiary of Johnson Controls International plc. Chemguard manufactured, marketed, promoted, and/or sold AFFF products that contained PFAS, including in Wisconsin.

32.     **Defendant Amerex Corporation** ("Amerex") is an Alabama corporation with its principal place of business in Trussville, Alabama. In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF in Europe. Amerex manufactured, marketed, promoted, and/or sold AFFF that contained PFAS, including in Wisconsin.

33.     **Defendant ChemDesign Products, Inc.** ("ChemDesign") is a Texas corporation with its principal place of business in Marinette, Wisconsin. ChemDesign manufactured, and/or sold fluorosurfactants containing PFAS for use in AFFF products, including in Wisconsin.

34.     **Defendant BASF Corporation** ("BASF") is a Delaware corporation with its principal place of business in Florham Park, New Jersey. BASF is the successor-in-interest of Ciba Holding, Inc., Ciba Corporation, Ciba Specialty Chemicals, and Ciba Geigy Corporation (collectively "Ciba"). BASF and/or Ciba (collectively, "BASF/Ciba") manufactured, marketed, promoted, distributed, and/or sold PFAS Products and AFFF products, including in Wisconsin.

35.     **Defendant Dynax Corporation** ("Dynax") is a Delaware corporation with its principal place of business in Elmsford, New York. Dynax manufactured, marketed, promoted, and/or sold AFFF products that contained PFAS, including in Wisconsin.

36.     **Defendant Clariant Corporation** ("Clariant") is incorporated in New York and has a principal place of business in Charlotte, North Carolina. Clariant is a subsidiary of Clariant Ltd, a Swiss company with headquarters in Muttenz, Switzerland, and with subsidiaries throughout the United States. Clariant was formed in 1995, via a name change from Sandoz Chemical Corporation, and in 1997, it acquired AFFF-related assets of Hoechst Specialty Chemicals. Clariant manufactured, marketed, promoted, and/or sold PFAS Products, including in Wisconsin.

37.     **Defendant Archroma U.S., Inc.** ("Archroma U.S.") is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Archroma U.S. was formed in 2013 when Clariant divested a product line relating to AFFF. Archroma U.S. manufactured, marketed, promoted, and/or sold PFAS Products, including in Wisconsin.

38.     **Defendant Carrier Global Corporation** ("Carrier") is a Delaware corporation with its principal place of business in Palm Beach Gardens, Florida. On information and belief, on or around April 3, 2020, UTC Fire & Security Americas Corporation completed the spin-off of one of its

11

reportable segments into a separate publicly-traded company known as Carrier Global Corporation ("Carrier"). Carrier's operations are classified into three segments: HVAC, Refrigeration, and Fire & Security. Upon information and belief, Carrier's Fire & Security products and services are sold under brand names including Chubb and Kidde. Carrier manufactured, marketed, promoted, and/or sold AFFF that contained PFAS, including in Wisconsin.

39. **Defendant UTC Fire & Security Americas Corporation, Inc.** ("UTC Fire & Security") is a Delaware corporation with its principal place of business in Farmington, Connecticut. Upon information and belief, UTC Fire & Security was a division of United Technologies Corporation. Upon information and belief, UTC Fire & Security manufactured, marketed, promoted, and/or sold AFFF that contained PFAS, including in Wisconsin.

40. **Doe Defendants 1-20** are unidentified entities or persons whose names are presently unknown and whose actions, activities, omissions (a) may have permitted, caused, and/or contributed to the PFAS contamination of the State's natural resources and property; or (b) may be vicariously responsible for entities or persons who permitted, caused, and/or contributed to the contamination of the State's natural resources and property; or (c) may be successors in interest to entities or persons who permitted, caused, and/or contributed to the contamination of the State's natural resources and property. After a reasonable search and investigation to ascertain the Doe Defendants

12

actual names, the Doe Defendants' actual identities are unknown to the State as they are not linked with any of the Defendants on any public source.

41.    The Doe Defendants 1-20, either in their own capacity or through another party, are liable for designing, manufacturing, marketing, promoting, distributing, selling, using, and/or disposing of PFAS Products in ways that caused widespread PFAS contamination of property and natural resources in Wisconsin—all while knowing to a substantial certainty that such contamination would occur.

42.    All Defendants and/or their predecessors in liability: (a) designed, marketed, developed, distributed, sold, manufactured, released, supplied, transported, arranged for disposal or treatment of, handled, and/or used PFAS Products in Wisconsin such that PFAS Products have contaminated and threatened the State's natural resources and property; (b) acted with actual or constructive knowledge that PFAS Products would be delivered into areas affecting the State's natural resources and property; (c) are legally responsible for and committed each of the wrongful acts alleged in this Complaint; and (d) affirmatively promoted PFAS Products for uses that they knew or should have known would result in the contamination of the State's natural resources and property, despite the availability of reasonable alternatives.

43.     When this Complaint references any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

44.     All references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

45.     When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally.

## JURISDICTION AND VENUE

46.     This action is brought at the request of Wisconsin Governor Evers and pursuant to the Wisconsin Attorney General's authority under Wis. Stat. § 165.25(1m) to redress and prevent harm to the "rights, interests or property of the State," Wis. Stat. § 14.11, and to enjoin public nuisances, Wis. Stat. §§ 823.01 and 823.02.

47.     The State brings this action in its capacity as sovereign, as trustee of State natural resources, and as property owner of lands and waters contaminated by Defendants' PFAS Products. It also pursues this action under

14

the State's *parens patriae* authority to protect its quasi-sovereign interests, including its interest in the health, safety, and welfare of its citizens.

48. This Court has personal jurisdiction over Defendants pursuant to Wis. Stat. § 801.05(1)(d), (3), and (4). At all times relevant to the Complaint, each Defendant has engaged in substantial business with and has substantial connections and/or contacts with the State of Wisconsin, including designing, developing, manufacturing, promoting, selling, distributing, storing, handling, using, and/or disposing of PFAS Products in Wisconsin. Defendants' acts and omissions—conducted both within and outside of Wisconsin—were a cause of the in-state injuries alleged in this Complaint.

49. Defendants' connections with the State of Wisconsin also satisfy the requirements of the Due Process Clause of the Fourteenth Amendment. Each Defendant has purposefully availed itself of the privilege of conducting business in Wisconsin. The causes of action in this Complaint arise from Defendants' design, manufacture, promotion, sale, distribution, use, and/or disposal of PFAS Products—conduct that occurred both within and outside of Wisconsin. In light of these substantial business connections with Wisconsin, the exercise of this Court's jurisdiction over Defendants is reasonable and consistent with traditional notions of fair play and substantial justice.

50. Venue is proper in this Court pursuant to Wis. Stat. § 801.50(2)(a) and (c) because Defendants have done substantial business in Dane County

and because State natural resources and property have been contaminated, injured, and damaged by PFAS contamination in Dane County.

## FACTUAL ALLEGATIONS

### I. PFAS Are Toxic and Pose Substantial Risks to Human Health and the Environment.

51. PFAS are a family of chemical compounds containing fluorine and carbon atoms.

52. For purposes of this Complaint, PFAS includes, but is not limited to, the following list of substances (including the chemicals themselves, as well as all of their salts, ionic states, acid forms of molecules, and "precursor" chemicals):[6]

   a. **Perfluorooctanoic acid (PFOA)** (Fluorinated Carbon Chain Length: C8) (Chemical Abstract Services Registry Number (CASRN): 335-67-1);

   b. **Perfluorooctanesulfonic acid (PFOS)** (Fluorinated Carbon Chain Length: C8) (CASRN: 1763-23-1);

   c. **Perfluorononanoic acid (PFNA)** (Fluorinated Carbon Chain Length: C9) (CASRN: 375-95-1);

   d. **Perfluorohexanoic acid (PFHxA)** (Fluorinated Carbon Chain Length: C6) (CASRN: 307-24-4);

   e. **Perfluorohexanesulfonic acid (PFHxS)** (Fluorinated Carbon Chain Length: C6) (CASRN: 355-46-4);

---

[6] All listed compounds are those that DNR expects laboratories to report when conducting testing for PFAS. *See* "Wisconsin DNR PFAS Updates," Wis. Dep't of Nat. Res., (Mar. 1, 2021), *available at* https://dnr.wisconsin.gov/sites/default/files/topic/PFAS/LabUpdate20210301.pdf.

f. **Perfluorobutanesulfonic acid (PFBS)** (Fluorinated Carbon Chain Length: C4) (CASRN: 375-73-5);

g. **Hexafluoropropylene oxide dimer acid (HFPO-DA or GenX)** (Fluorinated Carbon Chain Length: C6) (CASRN: 13252-13-6a);

h. **Perfluorotetradecanoic acid (PFTeA)** (Fluorinated Carbon Chain Length: C14) (CASRN: 376-06-7);

i. **Perfluorotridecanoic acid (PFTriA)** (Fluorinated Carbon Chain Length: C13) (CASRN: 72629-94-8);

j. **Perfluorododecanoic acid (PFDoA)** (Fluorinated Carbon Chain Length: C12) (CASRN: 307-55-1);

k. **Perfluoroundecanoic acid (PFUnA)** (Fluorinated Carbon Chain Length: C11) (CASRN: 2058-94-8);

l. **Perfluorodecanoic acid (PFDA)** (Fluorinated Carbon Chain Length: C10) (CASRN: 335-76-2);

m. **Perfluoroheptanoic acid (PFHpA)** (Fluorinated Carbon Chain Length: C7) (CASRN: 375-85-9);

n. **Perfluoropentanoic acid (PFPeA)** (Fluorinated Carbon Chain Length: C5) (CASRN: 2706-90-3);

o. **Perfluorobutanoic acid (PFBA)** (Fluorinated Carbon Chain Length: C4) (CASRN: 375-22-4);

p. **Perfluorodecanesulfonic acid (PFDS)** (Fluorinated Carbon Chain Length: C10) (CASRN: 335-77-3);

q. **Perfluorononanesulfonic acid (PFNS)** (Fluorinated Carbon Chain Length: C9) (CASRN: 68259-12-1);

r. **Perfluoroheptanesulfonic acid (PFHpS)** (Fluorinated Carbon Chain Length: C7) (CASRN: 375-92-8);

s. **Perfluoropentanesulfonic acid (PFPeS)** (Fluorinated Carbon Chain Length: C5) (CASRN: 2706-91-4);

t. **Perfluorooctanesulfonamide (PFOSA)** (Fluorinated Carbon Chain Length: C8) (CASRN: 754-91-6);

17

u. **Fluorotelomer sulphonic acid 8:2 (FtS 8:2)** (Fluorinated Carbon Chain Length: C8) (CASRN: 39108-34-4);

v. **Fluorotelomer sulphonic acid 6:2 (FtS 6:2)** (Fluorinated Carbon Chain Length: C6) (CASRN: 27619-97-2);

w. **Fluorotelomer sulphonic acid 4:2 (FtS 4:2)** (Fluorinated Carbon Chain Length: C4) (CASRN: 757124-72-4);

x. **2-(N-Ethylperfluorooctanesulfonamido) acetic acid (N-EtFOSAA)** (Fluorinated Carbon Chain Length: C8) (CASRN: 2991-50-6);

y. **N-Ethyl Perfluorooctane sulfonamide (N-EtFOSA)** (Fluorinated Carbon Chain Length: C8) (CASRN: 4151-50-2);

z. **N-Ethyl Perfluorooctane sulfonamidoethanol (N-EtFOSE)** (Fluorinated Carbon Chain Length: C8) (CASRN: 1691-99-2);

aa. **Perfluorooctandecanoic acid (PFODA)** (Fluorinated Carbon Chain Length: C18) (CASRN: 16517-11-6);

bb. **4,8-Dioxa-3H-perfluorononanoic acid (DONA)** (Fluorinated Carbon Chain Length: C7) (CASRN: 958445-44-8);

cc. **2-(N-Methylperfluorooctanesulfonamido) acetic acid (N-MeFOSAA)** (Fluorinated Carbon Chain Length: C8) (CASRN: 2355-31-9);

dd. **11-chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11Cl-PF3OUdS)** (Fluorinated Carbon Chain Length: C10) (CASRN: 763051-92-9b);

ee. **9-chlorohexadecafluoro-3-oxanone-1-sulfonic acid (9Cl-PF3ONS)** (Fluorinated Carbon Chain Length: C8) (CASRN: 756426-58-1c);

ff. **4,8-dioxa-3H-perfluorononanoic acid (ADONA)** (Fluorinated Carbon Chain Length: C7) (CASRN: 919005-14-4d).

53.     There are more than 3,000 different types of PFAS. The list contained in the above paragraph is not a complete list of PFAS that are the subject of this Complaint. The Complaint encompasses all of the thousands of PFAS, known or unknown. The State reserves its right to identify additional PFAS through discovery and as the science and research on the emerging PFAS crisis develops.

54.     PFAS are human-made, synthetic chemicals that do not exist naturally in the environment.

55.     PFAS have been used for decades in a wide array of consumer and industrial products. PFAS are used in many consumer products, including non-stick cookware, food packaging, stain resistant carpet and furniture, water resistant clothing, personal care products, and firefighting foam.

56.     PFAS enter the environment from industrial facilities that manufacture PFAS Products. Industries that are known sources of PFAS releases to the environment include textile and leather processing, paper mills, metal finishers, wire manufacturers, plating facilities, and manufacturers and facilities using fluorosurfactants, resins, molds, plastics, photolithography, and semiconductors. PFAS releases at industrial sites are generally due to direct wastewater discharge, as well as accidental releases such as leaks or spills.

57.     PFAS also enter the environment through the normal use and disposal of PFAS Products. Landfills receive industrial waste, sewage sludge, waste from site mitigation, and PFAS-bearing consumer goods. PFAS in landfills and former landfills can leach from these wastes into groundwater and surface water. PFAS may also be released from landfills in fugitive dust or directly to the atmosphere. Landfills constructed before 1990 that received industrial and construction waste deposits have a higher potential for contributing to PFAS releases because they were not required to be constructed with flexible membrane liners or other leachate control measures. Nationwide studies in the United States, as well as Canada and Europe, have shown high levels of PFAS in landfill leachate. The climatic and geological conditions in Wisconsin are susceptible to the generation and maintenance of contamination, and the hydrogeologic setting makes groundwater vulnerable to PFAS impacts from leachate and other PFAS releases.

58.     Municipal and industrial wastewater treatment plants are also repositories for industrial and consumer items containing PFAS. These facilities provide multiple pathways for PFAS from these sources to contaminate groundwater and surface water, including by point source discharges of effluent, leakage or unintended releases from sewerage or surface impoundments, air emissions, or disposal of biosolids or other byproducts generated during the treatment process.

59.     AFFF is also a major source of PFAS contamination in Wisconsin. AFFF is a fire-suppressing foam first developed in the 1960s to extinguish flammable liquid fires. For decades, PFAS have been used to manufacture AFFF. Firefighters apply AFFF by spraying the foam solution directly onto the fire, where it can then freely seep into surrounding soil and groundwater, and runoff into surface water. PFAS-containing AFFF has routinely been used in thousands of fire training exercises at military installations, civilian airports, local fire departments, and industrial facilities throughout the United States, including in Wisconsin. A single firefighting training event can discharge thousands of gallons of PFAS-containing AFFF foam solution into the natural environment.

60.     PFAS have unique characteristics that cause extensive and enduring environmental contamination. These synthetic chemicals are very mobile—i.e., PFAS can migrate long distances because they are highly soluble, they do not adsorb (stick) to soil particles, and so they readily transport through soil and groundwater. PFAS are also persistent—i.e., they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water. In short, once PFAS are applied, discharged, disposed of, or otherwise released onto land or into water, those compounds migrate through the environment and into groundwater,

surface water, fish, wildlife, and other natural resources; resist natural degradation; and are difficult and costly to remove from the environment.

61.     Humans are exposed to PFAS through ingestion of drinking water and contaminated food, inhalation, dermal contact, and other pathways. PFAS bioaccumulate in the human body and can bio-magnify in other organisms, particularly fish and mammals higher up in the food chain. PFAS can even be found in the blood of human infants, and protein-rich breast milk appears to be a source of PFAS exposure.

62.     PFAS contamination presents a significant threat to public health, property, and the environment.

63.     Even low doses of PFAS can result in adverse health effects for humans and animals. Those effects include but are not limited to:

- Liver damage;
- Altered cholesterol levels;
- Pregnancy-induced hypertension and/or preeclampsia;
- Thyroid disease;
- Dysregulation of the immune system;
- Increased risk of certain cancers;
- Increased risk of ulcerative colitis;
- Decreased fertility; and
- Decreases in birth weight.

22

64.     Because PFAS are persistent in the environment, these chemicals will remain within the State and continue to contaminate natural resources and property indefinitely, unless and until PFAS are actively treated, removed, or otherwise cleaned up from the environment.

## II.     Defendants Designed, Manufactured, Promoted, Sold, Used, and/or Disposed of PFAS Products Throughout the United States, Including in Wisconsin.

65.     PFAS were first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s.

66.     Beginning in the 1940s, 3M produced PFAS by electrochemical fluorination. This process results in a product that contains or breaks down into compounds containing PFOS, PFOA, PFNA, and/or PFHxS. 3M went on to market several PFOA and PFOS Products, including its Scotchgard brand of stain repellant, food packaging, textile treatments, and fluorosurfactants and additives, among many others.

67.     From the 1940s through the early 2000s, 3M was the primary manufacturer of PFAS in the United States. 3M was the only known domestic manufacturer of PFOS and PFHxS. 3M was also a major manufacturer of PFOA.

68.     3M manufactured PFAS as raw chemical materials for use in 3M products and products made by third parties. 3M marketed and sold PFAS

Products, including PFAS-containing AFFF, throughout the United States and Wisconsin.

69.     In response to pressure from the United States Environmental Protection Agency ("EPA"), 3M began phasing out production of PFAS Products in the early 2000s.

70.     In or around 1951, DuPont began to produce and sell polytetrafluoroethylene ("PTFE"), a fluoropolymer. The production of PTFE requires PFOA as a processing aid, and results in the presence of PFOA in some PTFE products. DuPont marketed its PTFE under the trade name "Teflon." PTFE is a fluoropolymer (*i.e.*, a plastic containing fluorine) used in a diverse range of applications, including as sprayable coating that resists heat, water, and oil; a lubricant; a coating for catheters and other medical equipment; and an oxidizer in flares—among many other uses.

71.     DuPont produced numerous other PFAS Products, and it marketed and sold PFAS Products throughout the United States, including in Wisconsin.

72.     DuPont also began producing PFOA for its own use and for sale in the early 2000s, after 3M ceased PFOA production. DuPont continued to manufacture, market, and sell PFOA until at least 2013.

73.     3M and DuPont were the only companies to manufacture PFOA in the United States.

74.     The remaining Defendants designed, manufactured, marketed, sold, and distributed large quantities of PFAS-containing AFFF and/or other PFAS Products in Wisconsin.

75.     By at least the 1970s, National Foam, Tyco/Ansul, and BASF/Ciba started manufacturing, marketing, and/or selling PFAS-containing AFFF, including in Wisconsin.

76.     Chemguard started to manufacture, market, and/or sell PFAS-containing AFFF as early as the 1990s, including in Wisconsin.

77.     Since its founding in 1991, Dynax has been a leading producer of specialized fluorochemicals and a primary fluorosurfactant provider for at least 3M and National Foam within the relevant time period. Dynax has manufactured, marketed, and/or sold AFFF that contained PFAS, including in Wisconsin.

78.     Starting in the late 1990s, Clariant manufactured, marketed, and/or sold AFFF that contained PFAS, including in Wisconsin.

79.     In the 2000s, Buckeye and Kidde began manufacturing, marketing, and/or selling PFAS-containing AFFF, including in Wisconsin.

80.     No later than 2011, Amerex manufactured, marketed, and/or sold PFAS-containing AFFF, including in Wisconsin.

81.     At least by 2013, Archroma U.S. manufactured, marketed, and/or sold PFAS-containing AFFF, including in Wisconsin.

82.     All Defendants designed, developed, manufactured, marketed, sold, distributed, supplied, transported, handled, used, released, and/or disposed of PFAS Products in Wisconsin in such a way as to cause harm to the State's natural resources, property, and citizens.

**III.  Defendants Knew of the Dangers Posed by Their PFAS Products.**

**A.  3M**

83.     More than half a century ago, 3M knew of the health hazards and environmental risks posed by PFAS.

84.     As early as the 1950s, 3M began testing the physiological and toxicological properties of PFAS. Based on these internal studies, 3M knew that PFAS were toxic to humans and the environment.

85.     In the 1950s, 3M also knew that PFAS had the ability to move throughout groundwater, and that PFAS bioaccumulate in humans and animals.

86.     As early as 1960, 3M knew that PFAS were capable of leaching into groundwater and contaminating the environment. Indeed, an internal memo from that year described 3M's understanding that chemical waste from 3M's PFAS manufacturing "[would] eventually reach the water table and pollute domestic wells."

87.     By at least the 1960s, 3M knew that some PFAS do not naturally degrade in the environment. One 1963 report by 3M described PFAS as being

stable in the environment, "completely resistant to biological attack," and "toxic." At around the same time, 3M also tested for PFAS in well waters and confirmed the presence of surfactant pollution in wells.

88.     As early as 1970, 3M knew that its PFAS Products were hazardous to marine life. 3M researchers also documented PFOA and PFOS in fish.

89.     In the 1970s, 3M began monitoring the blood of its employees for PFAS because it was concerned about the health effects of PFAS exposure. This research confirmed that PFAS bioaccumulate in humans. Indeed, at a 3M PFAS-manufacturing plant in Cottage Grove, Minnesota, workers had levels of fluorochemicals in their blood that were "1,000 times normal."

90.     In 1975, 3M found that there was a "universal presence" of PFOA in blood serum samples taken across the United States. Since PFOA is not naturally occurring, this finding should have alerted 3M to the likelihood that its products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company. This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the ubiquitous presence of PFOA in blood.

91.     During the late 1970s, 3M continued to research and confirm the dangers of PFAS. In a 1978 animal study conducted by 3M, the company

concluded that PFAS "should be regarded as toxic" and "urgently recommended that all reasonable steps be taken immediately to reduce exposure of employees to these compounds." In 1979, another 3M report concerning PFAS toxicity stated that the synthetic compounds were "more toxic than anticipated" and recommended that "lifetime rodent studies . . . be undertaken as soon as possible." Despite these warnings and recommendations, 3M decided to not publish the findings of this investigation.

92.     A 1979 memo from M.T. Case, formerly within 3M's medical department in Corporate Toxicology and Regulatory Services, stated that he believed it "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long-term chronic exposure."

93.     At a 1979 meeting among 3M employees about the "Fluorochemicals in Blood Program," an outside researcher named Dr. H.C. Hodge noted that "[r]eduction in exposure [to 3M employees to fluorochemicals] should have a top priority" and recommended that further testing be conducted. According to Dr. Hodge, "[i]t should be determined if FC-807 [a PFAS chemical] or its metabolites are present in man, what level they are present, and the degree of persistence (half-life) of these materials."

94.     In the late 1970s, 3M also continued to study the fate and transport characteristics of PFAS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from a 3M plant in Decatur, Alabama, and PFAS bioaccumulating in fish tissue taken from the Tennessee River. At around the same time, an internal report from 3M warned that PFOA and PFOS "are likely to persist in the environment for extended periods" and that one PFAS compound was "completely resistant to biodegradation."

95.     In 1981, 3M moved 25 female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure." This was based on internal research showing that PFAS compounds were causing birth defects in rats. Yet 3M did not alert the public or regulatory agencies of its concerns with effects of exposure to PFAS.

96.     In 1983, 3M scientists concluded that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of [PFAS] in the environment."

97.     3M's own ecotoxicologists continued raising concerns about PFAS until at least 1999.

98.     Despite decades of research, 3M first shared its concerns with the EPA in the late 1990s. In a May 1998 report submitted to EPA, "3M chose to report simply that PFOS had been found in the blood of animals, which is

true but omits the most significant information" according to a former 3M employee.

99.    Indeed, 3M's own employees were highly critical of 3M's management of PFAS risks. In March 1999, for example, 3M environmental scientist Rich Purdy wrote to 3M and expressed his "profound disappointment" with "3M's handling of the environmental risks associated with the manufacture and use of" PFOS. Mr. Purdy described PFOS as "the most insidious pollutant since PCB," and that it is "probably more damaging than PCB because it does not degrade, whereas PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB." Mr. Purdy described his attempts to discuss the dangers of the chemical with the company, and 3M's refusal to act. Finally, Mr. Purdy stated: "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

100.    Yet even as 3M phased out production of its PFAS Products in early 2000s because of pressure from the EPA, the company continued to publicly represent that those "products are safe." In stark contrast, the EPA stated in its press release regarding 3M's phase out of PFAS: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment,

have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." The EPA added that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

101.    Even after 3M ceased manufacturing PFAS, it worked to control and distort the science on PFAS and their dangers to the environment and human health. For example, 3M provided millions of dollars in grants to a professor, John Giesy, who publicly presented himself as independent but behind the scenes worked for 3M. Mr. Giesy's goal, as expressed in a 2008 email, was to "keep 'bad' papers [regarding PFAS] out of the literature [because] otherwise in litigation situations they can be a large obstacle to refute."

102.    In fact, as recently as November 2018, 3M publicly stated that "the vast body of scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current exposure levels, or even at the historically higher levels found in blood." And in 2019, 3M publicly claimed: "We do not believe that PFOS and PFOA cause harm to human health at levels that are typically found in the environment" and that "[w]e do not believe there is a public health issue related to PFOA and PFOS." These statements contradict decades of research demonstrating the serious health and

environmental effects of PFAS, including internal studies conducted by 3M's own scientists.

103.    3M knew or should have known that the ordinary use of its PFAS Products would injure public health and the environment in Wisconsin.

**B. DuPont**

104.    Like 3M, DuPont has known for decades of the health and environmental risks posed by PFAS.

105.    In approximately 1951, DuPont started using PFOA to make Teflon at its Washington Works manufacturing plant in Parkersburg, West Virginia. As early as 1954, employees at that plant reported that C8 (another name for PFOA) might be toxic. DuPont was concerned enough about the complaints that it delayed marketing Teflon to the public. In 1961, seven years later, Teflon consumer products hit the marketplace.

106.    By 1961, DuPont's researchers had concluded that PFOA was toxic and DuPont's chief toxicologist, Dorothy Hood, warned in a memo to executives that products containing PFOA should be "handled with extreme care." As early as the 1960s, DuPont knew that PFOA caused adverse liver reactions in dogs and rats.

107.    By at least 1966, DuPont was aware that PFOA could leach into groundwater.

108.     By 1976, DuPont knew about research showing detections of organic fluorine in blood bank samples in the United States, which the researchers thought could be a potential result of human exposure to PFOA.

109.     By 1979, DuPont had data indicating that its workers who were exposed to PFOA had a significantly higher frequency of health issues compared to unexposed workers. However, DuPont did not report these data to any government agency or any community where it used PFOA.

110.     By at least 1980, DuPont had internally confirmed that PFOA "is toxic," that "continued exposure [to PFOA] is not tolerable," and that people accumulate PFOA in their bodies.

111.     By at least 1981, DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries and enter the environment and natural resources.

112.     No later than 1981, DuPont had also obtained a 3M internal study that had documented birth defects in the eyes of unborn rats exposed to PFOA in utero. Based on this research, DuPont urged its female workers who came into contact with PFOA to consult their doctors "prior to contemplating pregnancy."

113.     Around this same time, a pregnant DuPont worker in the Teflon division of the Washington Works plant began moving PFOA waste into pits using a pump-like device as part of her job responsibilities. When the DuPont

employee gave birth in January 1981, the baby had only half a nose and a ragged eyelid that gaped down to the middle of his cheek. This was consistent with the 3M study, and in March 1981, DuPont had a pathologist and a birth defects expert review the 3M study. They concluded that "the study was valid" and that "the observed fetal eye defects were due to C8." DuPont immediately removed all female workers from areas where they might come into contact with PFOA.

114.    In April 1981, DuPont began monitoring 50 female employees who had been exposed to PFOA. As DuPont's medical director Bruce Karrh explained in a memo, this monitoring was undertaken to "answer a single question—does C8 cause abnormal children?" Initial data showed that two of the seven pregnant workers exposed to PFOA had babies with eye and nostril deformities, which the researchers concluded was "statistically significant." DuPont abandoned the study rather than inform regulators or employees.

115.    In a confidential November 1982 memo, DuPont's medical director warned about employees being exposed to potentially dangerous levels of PFOA. He recommended that all "available practical steps be taken to reduce this exposure."

116.    By at least the mid-1980s, DuPont was aware that PFOA is bio-persistent and bio-accumulative.

117.    DuPont was long aware it was releasing PFAS from its facilities that were leaching into groundwater used for public drinking. After obtaining data on these releases and the consequent contamination near DuPont facilities in West Virginia and Ohio, DuPont held a meeting in 1984 at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting"). DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials capable of eliminating additional PFOA releases from its operations. DuPont chose not to use either, despite knowing of PFOA's toxicity.

118.    During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They discussed DuPont's "incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." They also stated that "legal and medical will likely take the position of total elimination" of PFOA use and had "no incentive to take any other position."

119.    As early as 1988, DuPont began treating PFOA internally as a possible human carcinogen.

120.    In 1999, DuPont received preliminary results from a monkey health study showing that C8 caused monkeys to lose weight and increased

35

their liver size. Even monkeys given the lowest doses suffered liver enlargement, and one was so ill it had to be euthanized.

121. An internal DuPont memorandum regarding its litigation strategy shows that DuPont sought to "not create [the] impression that DuPont did harm to the environment" and wanted to "keep [the] issue out of the press as much as possible."

122. In 2000, John R. Bowman, a DuPont in-house counsel for C8 issues, wrote an email to several colleagues: "I think we need to make more of an effort to get [DuPont] to look into what we can do to get the Lubeck community a clean source of water or filter the C-8 out of the water." He continued:

> I think we are more vulnerable than the MTBE defendants [manufacturers of another dangerous groundwater contaminant, MTBE] because many states have adopted a drinking water guideline for MTBE and it is not biopersistent. My gut tells me the biopersistence issue will kill us because of an overwhelming public attitude that anything biopersistent is harmful.

> We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives. [Bernard Reilly, another DuPont attorney] and I have been unsuccessful in even engaging the clients in any meaningful discussion of the subject. Our story is not a good one, we continued to increase our emissions into the [Ohio] river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical.

123.    In a 2001 e-mail, DuPont in-house lawyer Bernard Reilly described DuPont's response to the C8 issue as "a debacle at best." Reflecting on a late 2001 meeting with EPA concerning PFAS contamination in Parkersburg, West Virginia, Reilly wrote of DuPont: "[T]he business did not want to deal with this issue in the 1990s, and now it is in their face, and some still are clueless. Very poor leadership, the worst I have seen in the face of a serious issue since I have been with DuPont."

124.    Notwithstanding its internal knowledge of PFOA's health and environmental risks beginning as early as the 1950s, DuPont publicly stated in 2003 that "[w]e are confident that there are no health effects associated with C-8 exposure," and that "C-8 is not a human health issue."

125.    DuPont's own Epidemiology Review Board (ERB) repeatedly raised concerns about DuPont's practice of stating publicly that there were no adverse health effects associated with human exposure to PFOA. In June 2005, DuPont reported to the press that "no human health effects are known to be caused by PFOA." An ERB member called that statement "[s]omewhere between misleading and disingenuous." In February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of DuPont's public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

37

126. Contrary to ERB's advice, DuPont's chief medical officer issued a press release in October 2006, stating that "there are no health effects known to be caused by PFOA." An ERB member criticized the press release because it "appear[ed] written to leave the impression 'don't worry.'"

127. DuPont knew or should have known that the ordinary use of its PFAS Products would injure public health and the environment in Wisconsin.

## C. The Additional Defendants

128. Tyco, Chemguard, Buckeye, Kidde, National Foam, Amerex, ChemDesign, BASF, Dynax, Clariant, Archroma, and Doe Defendants also knew—or at the very least should have known—that the ordinary and intended use of their PFAS Products would injure the natural environment and threaten public health in Wisconsin.

129. Tyco, Chemguard, Buckeye, Kidde, National Foam, Amerex, ChemDesign, BASF, Dynax, Clariant, Archroma, and Doe Defendants were all experts in the field of PFAS Products manufacturing and/or materials needed to manufacture PFAS Products.

130. By virtue of that expertise, Tyco, Chemguard, Buckeye, Kidde, National Foam, Amerex, ChemDesign, BASF, Dynax, Clariant, Archroma, and Doe Defendants all had detailed information and understanding about the chemical compounds that form PFAS Products.

131.    As manufacturers and sellers of AFFF, Tyco, Chemguard, Buckeye, Kidde, National Foam, Amerex, ChemDesign, BASF, Dynax, Clariant, Archroma, and Doe Defendants all had ready access to substantial information about PFAS.

132.    This information was also accessible to all of Defendants as part of their ongoing involvement in various trade associations and groups formed for the purpose of defending their industry, products, and conduct.

133.    One such group, the Firefighting Foam Coalition ("FFFC"), was formed in 2001 to dispel concerns the EPA had raised about AFFF's environmental viability. Many of the Defendants were members of the FFFC, including DuPont, Tyco, National Foam, Buckeye, and Kidde.

134.    Through their involvement in the FFFC, as well as a variety of other trade associations and groups, Defendants shared knowledge and information regarding PFAS. They also worked together to protect AFFF and other PFAS Products from scrutiny and to shield the AFFF industry from the detrimental impact of the public and regulators learning about PFAS's harms to human health and the environment.

## IV.  Defendants Failed to Act on Their Knowledge of the Health and Environmental Risks of PFAS.

135.    Despite their knowledge that PFAS Products posed grave environmental and human health risks, and despite the availability of safer

alternative products, Defendants failed to warn customers, users, the public, and the State about those risks, and they failed to take any other appropriate precautionary measures to prevent or mitigate PFAS contamination of the environment. Instead, Defendants falsely and misleadingly promoted PFAS Products as being environmentally sound and appropriate for widespread use.

136.    At all times relevant to this litigation, Defendants were or should have been aware that PFAS contamination and injury to the State's natural resources, property, and its citizens' public health were inevitable, due to the solubility of PFAS, the resistance to biodegradation and bioremediation, and the normal and foreseen use and disposal of PFAS in industrial processes, and in consumer, household, and commercial products manufactured, distributed, sold, and used in Wisconsin.

137.    Defendants possess—and have always possessed—vastly superior knowledge, resources, experience, and other advantages, in comparison to any person or government entity, concerning the manufacture, distribution, nature, and properties of PFAS Products.

138.    By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as chemists, engineers, and toxicologists, Defendants have at all relevant times been in a position to know, identify, and confirm the threat PFAS posed and poses to State natural resources, property, and the health of residents.

139. In addition, by virtue of this superior knowledge, and/or by virtue of Defendants' partial and incorrect statements regarding the nature and impacts of PFAS, Defendants had a duty to disclose the truth and to act in accordance with the truth about PFAS.

140. Defendants failed to take reasonable steps to eliminate or reduce the dangers posed by their PFAS Products. Instead, they concealed and misrepresented those dangers to the consumers, the public, and the State.

## V. Defendants Caused Widespread PFAS Contamination in Wisconsin.

141. Defendants have caused widespread PFAS contamination in Wisconsin by designing, manufacturing, promoting, selling, distributing, using, and/or disposing of PFAS Products in the State; by failing to adequately investigate and test those Products to ensure that they would not cause harm to the public or the environment; by failing to adopt measures or product designs that could have reduced or eliminated the known dangers of PFAS Products; and by concealing and misrepresenting the adverse health and environmental impacts of PFAS.

142. At all times relevant to this action, Defendants had superior knowledge of the dangers of PFAS and concealed and/or failed to sufficiently disclose those dangers. Because of Defendants' superior knowledge and tortious conduct, the risks associated with PFAS were concealed from non-

41

Defendant end users, owners, and operators of sites from which PFAS have been released to the environment in Wisconsin.

143. Because of Defendants' tortious conduct, the risks associated with PFAS were unknown to users and consumers of PFAS Products and were unknown to the State until recently.

144. Defendants' PFAS Products are the major sources of PFAS contamination in Wisconsin. PFAS from those Products have contaminated soil, groundwater, surface water, sediments, fish, wildlife, marine resources, other biota, and other natural resources located throughout the State. Numerous locations in Wisconsin are contaminated and injured by Defendants' PFAS Products, including but not limited to the following areas:[7]

   a. Eau Claire Water Treatment Facility (Eau Claire, WI): PFAS contamination has leached into the groundwater supply, suspected from AFFF use at the Chippewa Valley Regional Airport. The City is currently pumping approximately five million gallons per day from three wells into lagoons to prevent the pollution from migrating into clean wells. This has resulted in multiple city wells being shut down.

---

[7] A list of sites where DNR has determined that further action is required due to confirmed PFAS contamination is maintained at https://dnr.wi.gov/botw/GetPfasReport.do.

b. Fort McCoy Fire Training Sites (Fort McCoy, WI): Fort McCoy is home to fire training areas, each contaminated with PFAS due to AFFF use at each of the sites. The contamination here has resulted in the need for soil removal and groundwater contamination remediation, as contaminated groundwater has migrated from the sites towards Silver Creek, a water body currently impaired for PFOS in fish tissue, and Suukjak Sep Creek. Detections of PFOS, PFOA, and/or PFBS exceeded the Office of the Secretary of Defense's Risk Screening Levels for groundwater at all three sites and for soil at Pit 3.

c. General Mitchell Airport (Milwaukee, WI): PFAS contamination on site is confirmed in surface water, groundwater, stormwater, and soil due to AFFF use on site. Sampling of environmental media revealed PFOS and PFOA contamination, in addition to detections of other PFAS. Discharges have migrated offsite and impacted the Kinnickinnic River Watershed and are suspected to have impacted the Oak Creek Watershed.

d. Tyco (Marinette and other locations, WI): There are multiple sites within the State for which Tyco and its related entities are responsible. Groundwater sampling has revealed varying levels of PFOS, PFOA, PFBS, PFDA, PFHpA, PFHxA, PFHxS, PFPA, and

other PFAS at sites attributable to Tyco and its related entities' operations and PFAS Products. Contamination of private wells, rights of way, stormwater, biosolids, sediment, soil, fish, and surface water attributable to Tyco and its related entities has also been confirmed. In September of 2020, DNR and DHS placed restrictions on the consumption of white-tailed deer liver inside of an existing advisory area because of PFOS attributable to Tyco and its related entities.

e. Campbell and La Crosse, WI (various sites): Multiple locations around French Island have been impacted by AFFF use at the La Crosse Regional Airport and other potential sources. These impacts extend to the City of La Crosse and the Town of Campbell on French Island. Drinking water supplies have become contaminated, including multiple public wells, and in Campbell, nearly 1,500 private wells. The State is currently spending between $500,000 and $600,000 per year to provide bottled water to residents of the Town of Campbell. Multiple well samples taken in Campbell indicated elevated levels of a combination of PFOS and PFOA, and multiple groundwater samples taken from around the La Crosse Regional Airport revealed elevated levels of PFOS, PFOA, and PFHxS, as well as detections of other PFAS.

f. Mirro Aluminum Company site (Manitowoc, WI): In Manitowoc, two different sites (Plant Nos. 2 and 9) historically used for heavy industrial operations and aluminum cookware manufacturing by the Mirro company, have had PFAS detected in both soil and groundwater, which was "found at almost every location sampled" at one site. The extent of the contamination is still being delineated, though contamination is known to have migrated off site from Plant No. 9 and PFAS contamination has been detected in residential private wells near Plant No. 2.

g. Rhinelander/Oneida County Airport (Rhinelander, WI): AFFF use on site is believed to have contributed to the contamination of Rhinelander Municipal Well No. 7 as well as other contamination on site, and in the surrounding community, including impacts to Municipal Well No. 8 and to several private wells. As a result of the contamination, Municipal Wells Nos. 7 and 8 are currently suspended; the suspension of the two wells has resulted in up to 25 percent of the potable water needs not being met for the service area and will likely yield residential, commercial, emergency, and other water shortages.

h. Truax Field/Dane County Regional Airport (Madison, WI): Truax Field and Dane County Regional Airport are home to an Air

45

National Guard Base and the second-busiest commercial airport in the state. Flanked by two former fire training areas, the Darwin Street fire training area and the Pearson Street fire training area, the site has become contaminated with PFAS due to AFFF use. Sampling confirmed that PFOA and PFOS contamination has spread to nearby Starkweather Creek, a water body that flows through residential areas, is utilized for recreational purposes, and drains into Lake Monona. Starkweather Creek and Lake Monona have fish consumption advisories because of PFOS in fish tissue.

i. Volk Field (Camp Douglas, WI): Volk Field is home to an Air National Guard Base and has five field areas designated as contaminated sites: Field Areas 1, 2, 4, 5, and 6. Area 1 is a former fire training area and was host to burn pits where AFFF was used. Area 2 was a spray nozzle test area, where AFFF was used in exercises; Area 3 was the alternate test area site. Area 4 was in operation until 1995 and collected fluid wastes from across the facility for treatment. Area 5 was where a KC-97 refueling aircraft crashed, where AFFF was likely used in extinguishing the fire, as PFOS and PFOA were detected in groundwater and soil at elevated levels. Area 6 was the secondary settling pond also in operation until 1995; PFOS and PFOA were detected in both

46

groundwater and surface water at elevated levels. Areas 1 and 5 have had the highest documented concentration levels, with documentation of PFOS and PFOA concentrations in groundwater exceeding 1,000 ppt; both sites have access to ambient groundwater flow near the Lemonweir River.

145.    PFAS contamination from Defendants' products has also resulted in the injury or contamination of state-owned property and other resources owned and/or held by the State, such as its public trust resources and the navigable waters throughout Wisconsin.

146.    The State's property, public trust resources, and natural resources have been contaminated and injured by the ordinary and foreseeable use and disposal of Defendants' PFAS Products. This contamination not only endangers public health, but also threatens Wisconsin's economy, which depends heavily on the State's abundant and untainted resources. Impacts to agricultural and other processing operations such as meat and dairy affects employment of the State's citizens and results in lost revenue for the State.

147.    Likewise, Wisconsin's tourism industry attracts visitors with its diverse geography of lakes, rivers, and forests for hunting, fishing, boating, hiking, camping, birding, biking, and many other forms of outdoor and natural recreation. These economic sectors and others are threatened by pervasive and dangerous PFAS contamination in Wisconsin.

47

**A. Groundwater**

148. Groundwater is a precious, limited, and invaluable State natural resource.

149. Nearly 70 percent of Wisconsinites rely on groundwater for drinking water.

150. The people of Wisconsin also use groundwater to irrigate agricultural crops and to provide drinking water to animals raised for human consumption in the State.

151. Defendants' PFAS Products have contaminated and injured the groundwater throughout the state of Wisconsin, including—but not limited to—at the following locations:

    a. Marinette and Town of Peshtigo – PFAS contamination was found in groundwater in the Marinette and Peshtigo area.

    b. La Crosse and the Town of Campbell – PFAS contamination was found in two municipal wells in the City of La Crosse and groundwater near the La Crosse Regional airport on French Island affecting private wells in the Town of Campbell.

    c. Rhinelander and Town of Crescent, Oneida County – PFAS contamination was found in two municipal wells in the City of Rhinelander and in Crescent Town Spring.

    d. Madison – PFAS contamination forced the Madison Water Utility to shut down a municipal well.

    e. Eau Claire – PFAS contamination forced the City of Eau Claire to shut down four municipal wells.

    f. Rib Mountain – PFAS contamination forced the Rib Mountain Sanitary District to shut down two of its four municipal wells.

g. Wausau – All six Wausau Water Works wells currently contain PFAS.

h. Rothschild – PFAS contamination forced the Rothschild Water Utility to shut down a municipal well.

i. Weston – PFAS contamination forced the Weston Water Utility to shut down two of its four municipal wells.

j. West Bend – PFAS contamination forced the West Bend Water Utility to shut down a municipal well.

k. Marshfield – PFAS contamination forced the Marshfield Utilities to shut down four municipal wells.

l. Mosinee – PFAS contamination forced the Mosinee East System to reduce usage from one municipal well.

m. Rib Mountain – PFAS contamination forced the Rib Mountain Sanitary District to shut down two municipal wells intermittently and undertake installation of a temporary emergency treatment system.

n. Adams – PFAS contamination forced the Adams Waterworks to shut down one municipal well.

152.    Defendants have caused PFAS contamination of groundwater at these and a myriad of other locations in Wisconsin by manufacturing, promoting, selling, distributing, using, and/or disposing of PFAS Products—all while knowingly concealing and misrepresenting the dangers posed by those products to groundwater.

**B. Surface Water**

153.    Surface waters are precious, limited, and invaluable State natural resources that are used for drinking water, irrigation, recreation, fishing, and other important purposes.

49

154.   Wisconsin borders Lake Michigan to the east, Lake Superior to the north, and the Mississippi and St. Croix Rivers to the west. The State contains thousands of lakes, rivers, and streams.

155.   Roughly 30 percent of Wisconsinites rely on surface water from lakes for their drinking water, and more than 1.6 million of the State's residents draw their drinking water from Lake Michigan or Lake Superior.

156.   Wisconsin's lakes and rivers are also central to the State's economic well-being. Half of the State's population lives within the Great Lakes basin, and those Lakes have fueled valuable tourism and recreation industries, including a recreational boating sector worth more than $9 billion a year. Over a million anglers fish Wisconsin waters annually, generating more than $2.3 billion in fishing-related economic activity and supporting over 21,500 fishing-related jobs.

157.   Defendants' PFAS Products have contaminated and injured the State's surface waters throughout Wisconsin, including—but not limited to— the following locations, each of which are listed as impaired surface waters:[8]

    a. Biron Flowage

---

[8] The listed waters are impaired due to PFOS in fish tissue. Fish consumption advisories have been issued for these waterbodies. The restrictions on fish consumption demonstrate an impairment of the public health and welfare designated use. Other PFAS have been detected in additional surface waters, but not to levels necessary to list as impaired at this time. A further list of impaired waters can be found at https://dnr.wisconsin.gov/topic/SurfaceWater/ConditionLists.html.

     b. Lake Kegonsa

     c. Lake Superior

     d. Lake Monona

     e. Lake Waubesa

     f. Mississippi River

     g. Petenwell Flowage

     h. Silver Creek

     i. Starkweather Creek

     j. Upper and Lower Mud Lake

     k. Wingra Creek

158. Defendants have caused PFAS contamination of surface waters at these and a myriad of other locations in Wisconsin by manufacturing, promoting, selling, distributing, using, and/or disposing of PFAS Products—all while knowingly concealing and misrepresenting the dangers posed by those Products to surface waters.

**C. Biota**

159. The State's biota—including both flora and fauna—are critical ecological resources.

160. Wisconsin is the home to over 200 endangered or threatened species of animals and plants.

161.  The State's biodiversity provides a wealth of ecological, social, and economic goods and services that are an integral part of cultural and economic activity in Wisconsin.

162.  Hunting, fishing, and wildlife watching, for example, generate billions of dollars each year through tourism and recreation.

163.  Wisconsin's fish, marine resources, and wild game also provide important sources of food.

164.  Injuries to Wisconsin's biota impact not only the individual species, but also the entire ecosystem of which they are a part.

165.  Defendants' PFAS Products have contaminated and injured biota resources throughout Wisconsin.

For example, the State has issued fish consumption advisories,[9] including but not limited to the following species and their respective water bodies, due to PFAS contamination in surface waters across the State:

    a.  Bluegill, in Mississippi River Pools 3, 4, 5, 5a, and 6; in the Wisconsin River (from dam at Nekoosa to the Petenwell Dam); and in parts of the Yahara chain of lakes including Wingra Creek, Lake

---

[9] See "Choose Wisely: A Health Guide for Eating Fish in Wisconsin 2020-2021," Wis. Dep't of Nat. Res., 5 (2020), available at https://widnr.widen.net/s/lxhdnp5jtn/choosewisely. See also, e.g. "DNR asks anglers near Bay of Green Bay to avoid eating rock bass more than once a week due to 'forever chemical' contamination," Milwaukee J. Sentinel (Jan. 18, 2022), available at https://www.jsonline.com/story/news/local/wisconsin/2022/01/18/dnr-issues-pfas-advisory-rock-bass-rivers-near-bay-green-bay/6567195001/.

Monona, Starkweather Creek, Lake Waubesa, Upper and Lower Mud Lake, Lake Kegonsa, and the Yahara River downstream to the Rock River;

b. Brook trout in Silver Creek;

c. Brown trout in the Black Earth Creek downstream to the confluence with Blue Mound Creek; and in Silver Creek;

d. Crappie in Mississippi River Pools 3, 4, 5, 5a, and 6; in the Wisconsin River (from dam at Nekoosa to the Petenwell Dam); and in parts of the Yahara chain of lakes including Wingra Creek, Lake Monona, Starkweather Creek, Lake Waubesa, Upper and Lower Mud Lake, Lake Kegonsa, and the Yahara River downstream to the Rock River;

e. Largemouth bass in parts of the Yahara chain of lakes including Wingra Creek, Lake Monona, Starkweather Creek, Lake Waubesa, Upper and Lower Mud Lake, Lake Kegonsa, and the Yahara River downstream to the Rock River;

f. Northern pike in parts of the Yahara chain of lakes including Wingra Creek, Lake Monona, Starkweather Creek, Lake Waubesa, Upper and Lower Mud Lake, Lake Kegonsa, and the Yahara River downstream to the Rock River;

g. Pumpkinseed in parts of the Yahara chain of lakes including Wingra Creek, Lake Monona, Starkweather Creek, Lake Waubesa, Upper and Lower Mud Lake, Lake Kegonsa, and the Yahara River downstream to the Rock River;

h. Rainbow smelt in Lake Superior;

i. Rock bass in Green Bay and its tributaries, the Peshtigo, Oconto and Menominee Rivers;

j. Walleye in parts of the Yahara chain of lakes including Wingra Creek, Lake Monona, Starkweather Creek, Lake Waubesa, Upper and Lower Mud Lake, Lake Kegonsa, and the Yahara River downstream to the Rock River;

k. White bass in the Wisconsin River (from Whiting Plover Dam to the Biron Dam); and

l. Yellow perch in the Wisconsin River (from dam at Nekoosa to the Petenwell Dam); and in parts of the Yahara chain of lakes including Wingra Creek, Lake Monona, Starkweather Creek, Lake Waubesa, Upper and Lower Mud Lake, Lake Kegonsa, and the Yahara River downstream to the Rock River.

166. Defendants have caused these and other adverse impacts to biota in Wisconsin by manufacturing, promoting, selling, distributing, using, and/or disposing of PFAS Products—all while knowingly concealing and

misrepresenting the dangers posed by those Products to flora and fauna.

## VI. The State Continues to Investigate and Respond to PFAS Contamination.

167. The State has discovered and continues to discover the existence of massive PFAS contamination in Wisconsin.

168. The State has promptly investigated and responded to PFAS contamination located throughout Wisconsin through wide-ranging actions involving multiple state agencies.

169. In March 2018, DNR requested that the Department of Health Services ("DHS") recommend state health-based groundwater quality standards for 16 substances if adequate toxicological data were available, including PFOA and PFOS. In June 2019, the DHS developed recommended groundwater standards for PFOA and PFOS among other substances, pursuant to its authority under the 1983 Groundwater law, Wis. Stat. § 160.07, and transmitted those recommendations to DNR.

170. In April 2019, DNR also requested that DHS recommend health-based groundwater quality standards for a number of additional substances which included 16 additional PFAS, such as PFHxS, PFHxA, PFNA, PFBA, and PFBS. In November 2020, DHS finalized its recommendations and transmitted those recommendations to DNR. DNR began a rulemaking process to codify those recommendations, and that process remains ongoing.

171.  In recent years, DHS has also worked in partnership with other state and local agencies to assess health risks and known PFAS contamination sites in the municipalities of Marinette, Peshtigo, Rhinelander, La Crosse/Campbell, and Madison and advised the public on how best to minimize exposure to PFAS. DHS evaluated risks of exposure presented by groundwater, drinking water, surface water, and wildlife.

172.  In the summer of 2019, for example, DNR collected water chemistry and fish tissue samples from waterbodies near known or suspected PFAS contamination sites in the Yahara chain of lakes and Starkweather Creek in Madison as part of a water quality PFAS initiative. Starkweather Creek had the highest concentration of PFOA and PFOS among the samples taken by the DNR statewide in 2019. In mid-September 2019, DNR staff collected additional bluegill and largemouth bass for PFAS analysis from Lake Monona near the Starkweather Creek outlet. PFOS was detected in all fish collected from Lake Monona and Starkweather Creek. In October 2019, additional surface water sampling was conducted at the four original sampling locations, as well as 11 new locations in Starkweather Creek and five locations in Lake Monona. The concentrations of PFOS found in Starkweather Creek and tributaries in the areas adjacent to the Dane County airport complex ranged from less than 5 parts per trillion (ppt) to 3,700 ppt. PFOS concentrations in samples from Lake Monona ranged from 9.8 ppt to 12 ppt,

and PFOA concentrations ranged from 2.4 ppt to 2.9 ppt. Based on results of fish tissue sampling in 2020, DNR and DHS issued PFAS-based fish consumption advisories for Lake Monona and Starkweather Creek on January 15, 2020, and the Yahara chain of lakes in Dane and Rock counties on June 9, 2021. Elevated levels of PFOS were found in several species collected from lakes Kegonsa and Waubesa. On March 3, DNR issued a fish consumption advisory for Black Earth Creek to its confluence with Blue Mounds Creek.

173. DHS also conducted a biomonitoring study to identify exposure patterns among Burmese immigrant populations in the Milwaukee area. Observed PFAS concentrations in blood samples were significantly higher in the blood of Burmese immigrant angler populations, who practice subsistence fishing, than national reference levels. A previous biomonitoring study among a cohort of older Wisconsin anglers demonstrated correlations between blood levels of certain PFAS and consumption of locally caught fish.

174. DHS has also conducted and participated in numerous outreach and education efforts with public health and environmental science professionals, emergency responders, and legislators to increase awareness of the health implications of PFAS and support risk management and policy decision making by those stakeholders.

175.  It is virtually certain that additional testing will reveal further PFAS contamination and injury of groundwater, surface waters, soils, sediments, and biota in locations throughout Wisconsin.

176.  Because PFAS resist biodegradation and migrate long distances once released into the environment, PFAS continue to spread through the Wisconsin environment. In addition, PFAS contamination levels typically fluctuate over time due to PFAS's high mobility and other factors such as changes in seasonal precipitation levels. Accordingly, PFAS levels at any given site may vary from year to year, and the only way to eliminate the health and ecological impacts of PFAS contamination is to remediate or treat the PFAS.

177.  Absent large-scale PFAS treatment and/or remediation, PFAS contamination will continue to spread through the State's natural resources and property, indefinitely threatening and harming the public health, environment, and economic welfare of the State.

178.  There exist proven, cost-effective techniques for cleaning up PFAS in the environmental media and for successfully treating drinking water. For example, PFAS can be removed from drinking water using granular activated carbon treatment ("GAC"), reverse osmosis, electrochemical oxidation, and anion exchange. The costs of designing, installing, deploying, operating, and maintaining these and other treatment technologies in addition to studying, designing, implementing,  and  monitoring remediation  efforts

throughout the State will undoubtedly run into the billions of dollars. Thus, even though these treatment techniques are reasonable and cost effective, the investigation and clean-up costs will be significant and will increase the longer PFAS contamination remains in the environment.

179.   Under Wisconsin law, Defendants should bear the necessary clean-up costs because it is Defendants who profited immensely from selling PFAS Products while simultaneously concealing and misrepresenting the dangerous effects of those products on public health and the environment.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Continuing Public Nuisance

180.   The State of Wisconsin incorporates by reference the allegations in the preceding paragraphs of the Complaint.

181. PFAS contamination of property and natural resources in Wisconsin constitutes a public nuisance because it unreasonably interferes with the use of public places, with the activities of an entire community, and with rights common to the general public. Among other things, PFAS contamination substantially and unreasonably endangers public health and safety by exposing the State's citizens to highly toxic chemicals; impairs Wisconsinites' public rights to use and enjoy the State's natural resources and public property; interferes with the State's *parens patriae* duties to protect,

59

conserve, and manage the State's natural resources for the benefit of the public; and injures the State's quasi-sovereign interests in the health and well-being—both physical and economic—of its residents.

182.  PFAS contamination in Wisconsin constitutes a continuing public nuisance because there exist reasonable, cost-effective methods for treating, remediating, and/or abating that contamination and its attendant hazards to public health, the environment, and Wisconsin's economy. In addition, because PFAS contamination continues to move and spread throughout Wisconsin, and because PFAS levels at any given contamination site fluctuate over time, this public nuisance represents an ongoing, repeated, and harmful disturbance of public rights.

183.  Defendants intentionally, recklessly, and/or negligently caused the alleged public nuisance by designing, marketing, developing, distributing, selling, manufacturing, releasing, supplying, using, and/or disposing of PFAS Products—all while knowing to a substantial certainty that the intended use of these PFAS Products would result in widespread contamination in Wisconsin, knowing to a substantial certainty that PFAS are dangerous to human health and the environment, and misrepresenting those dangers to consumers, the public, and the State.

184.  Among other things, each Defendant is a substantial factor in creating and/or maintaining a public nuisance in Wisconsin as follows:

a. Defendants designed, manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce PFAS Products that were delivered into the State and areas affecting the State's natural resources and property, when Defendants knew or reasonably should have known: (i) PFAS would be released readily into the environment during the normal, intended, and foreseeable uses of PFAS Products; (ii) when released, PFAS would persist in the environment and not break down; (iii) PFAS would contaminate State natural resources and property, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies; (iv) PFAS posed substantial risks to human health and the environment; and (v) ultimately, PFAS would be difficult and costly to remove.

b. Defendants disposed of PFAS Products in landfills or through other methods, when they knew or reasonably should have known: (i) PFAS would be released readily into the environment through the disposal process; (ii) when released, PFAS would persist in the environment and not break down; (iii) PFAS would contaminate State natural resources and property, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies; (iv) PFAS posed substantial risks to human health and

the environment; and (v) ultimately, PFAS would be difficult and costly to remove.

c. Defendants spilled, leaked, released, or otherwise caused the discharge of PFAS Products into the environment, when they knew or reasonably should have known: (i) their conduct would readily release PFAS into the environment; (ii) when released, PFAS would persist in the environment and not break down; (iii) PFAS would contaminate State natural resources and property, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies; (iv) PFAS posed substantial risks to human health and the environment; and (v) ultimately, PFAS would be difficult and costly to remove.

d. Defendants failed (i) to adequately test and investigate the dangers posed by their PFAS Products; (ii) to provide adequate warnings about the health and environmental risks posed by PFAS; (iii) to provide adequate instructions as to the handling, use, and disposal of PFAS Products; and/or (iv) to take any other reasonable, precautionary measures to prevent or mitigate PFAS contamination.

e. Defendants affirmatively misrepresented the hazards of PFAS in their product information, product instructions, promotional

62

materials, and public statements, and/or failed to provide adequate warnings about the health and environmental risks posed by PFAS.

185. The harm flowing from PFAS contamination in Wisconsin is extremely grave, and it far outweighs the social utility of Defendants' nuisance-causing conduct because:

    a. PFAS contamination in Wisconsin imposes severe, unavoidable, and costly health risks on the State's citizens, communities, and health-care systems.

    b. The adverse impacts of PFAS contamination of Wisconsin's groundwater, surface waters, lands, and biota are pervasive and significant.

    c. It is difficult and costly to treat, remove, and/or remediate PFAS contamination throughout the State.

    d. There were PFAS-free substitutes for many of Defendants' PFAS Products.

    e. Considering Defendants' extensive knowledge of the hazards posed by PFAS and their deep scientific and engineering expertise, it was feasible and reasonable for Defendants to investigate, pursue, develop, and adopt safer alternatives to their PFAS Products, including—but not limited to—providing adequate warnings of the

dangers posed by PFAS Products and supplying adequate instructions on the safe handling, use, and disposal of PFAS Products.

f. Defendants promoted PFAS Products by concealing and misrepresenting the adverse health and environmental impacts of those products—commercial activity that has no social utility whatsoever.

186. As a direct and proximate cause of Defendants' acts and omissions, the State has incurred, is incurring, and will continue to incur investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to PFAS contamination of natural resources and property throughout Wisconsin.

187. As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

188. Defendants' acts and omissions have caused or threatened to cause injuries to property and natural resources in Wisconsin that are indivisible.

189. The State is entitled to damages and equitable abatement of the injurious PFAS contamination caused by Defendants.

## SECOND CAUSE OF ACTION
### Continuing Private Nuisance

190.  The State of Wisconsin incorporates by reference the allegations in the preceding paragraphs of the Complaint.

191.  PFAS contamination in Wisconsin constitutes a private nuisance because it unreasonably interferes with the private use and enjoyment of property. Among other things, PFAS contamination substantially and unreasonably endangers public health and safety by exposing the State's citizens to highly toxic chemicals; it impairs Wisconsinites' ability to use and enjoy property and natural resources located within the State; and it impairs the States' use of its own property and natural resources.

192.  PFAS contamination in Wisconsin constitutes a continuing private nuisance because there exist reasonable, cost-effective methods for treating, remediating, and abating that contamination and its attendant hazards to public health and the environment. In addition, because PFAS contamination continues to move and spread throughout Wisconsin, and because PFAS levels at any given contamination site fluctuate over time, the alleged private nuisance represents an ongoing, repeated, and harmful disturbance of property interests and rights.

193.  Defendants intentionally, recklessly, and/or negligently caused the alleged private nuisance by designing, marketing, developing, distributing,

selling, manufacturing, releasing, supplying, using, and/or disposing of PFAS Products—all while knowing to a substantial certainty that the intended use of these PFAS Products would result in widespread PFAS contamination in Wisconsin, knowing to a substantial certainty that PFAS Products are dangerous to human health and the environment, and concealing and misrepresenting those dangers to consumers, the public, and the State.

194. Among other things, each Defendant is a substantial factor in creating and/or maintaining a private nuisance in Wisconsin as follows:

    a. Defendants designed, manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce PFAS Products that were delivered into the State and areas affecting property and natural resources throughout Wisconsin, when they knew or reasonably should have known: (i) PFAS would be released readily into the environment during the normal, intended, and foreseeable uses of PFAS Products; (ii) when released, PFAS would persist in the environment and not break down; (iii) PFAS would contaminate State natural resources and property, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies; (iv) PFAS posed substantial risks to human health and the environment; and (v) ultimately, PFAS would be difficult and costly to remove.

b. Defendants disposed of PFAS Products in landfills or through other methods, when they knew or reasonably should have known: (i) PFAS would be released readily into the environment through the disposal process; (ii) when released, PFAS would persist in the environment and not break down; (iii) PFAS would contaminate property and natural resources throughout the State, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies; (iv) PFAS posed substantial risks to human health and the environment; and (v) ultimately, PFAS would be difficult and costly to remove.

c. Defendants spilled, leaked, released, or otherwise caused the discharge of PFAS Products into the environment, when they knew or reasonably should have known: (i) their conduct would readily release PFAS into the environment; (ii) when released, PFAS would persist in the environment and not break down; (iii) PFAS would contaminate property and natural resources throughout the State, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies; (iv) PFAS posed substantial risks to human health and the environment; and (v) ultimately, PFAS would be difficult and costly to remove.

d. Defendants failed (i) to adequately test and investigate the dangers posed by their PFAS Products; (ii) to provide adequate warnings about the health and environmental risks posed by PFAS Products; (iii) to provide adequate instructions as to the handling, use, and/or disposal of PFAS Products; and/or (iv) to take any other reasonable, precautionary measures to prevent or mitigate PFAS contamination.

195. Defendants affirmatively misrepresented the hazards of PFAS Products in their product information, product instructions, promotional materials, and public statements, and/or failed to provide adequate warnings about the health and environmental risks posed by PFAS. The harm flowing from PFAS contamination in Wisconsin is extremely grave, and it far outweighs the social utility of Defendants' nuisance-causing conduct because:

a. PFAS contamination in Wisconsin imposes severe, unavoidable, and costly health risks on the State's citizens, communities, and health-care systems.

b. The adverse impacts of PFAS contamination of Wisconsin's groundwater, surface waters, lands, and biota are pervasive and significant.

c. It is difficult and costly to treat, remove, and/or remediate PFAS contamination throughout the State.

68

    d. There were PFAS-free substitutes for many of Defendants' PFAS Products.

    e. Considering Defendants' extensive knowledge of the hazards posed by PFAS and their deep scientific and engineering expertise, it was feasible and reasonable for Defendants to investigate, pursue, develop, and adopt safer alternatives to their PFAS Products, including—but not limited to—providing adequate warnings of the dangers posed by PFAS and supplying adequate instructions on the safe handling, use, and disposal of PFAS Products.

    f. Defendants promoted PFAS Products by concealing and misrepresenting the adverse health and environmental impacts of those products—commercial activity that has no social utility whatsoever.

196. As a direct and proximate cause of Defendants' acts and omissions, the State has incurred, is incurring, and will continue to incur investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to PFAS contamination of property and natural resources throughout the State.

197. As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other substantial expenses

and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

198.   Defendants' acts and omissions have caused and/or threatened to cause injuries to property and natural resources in Wisconsin that are indivisible.

199.   The State is entitled to damages and equitable relief requiring Defendants to take such action as may be necessary to abate the injurious PFAS contamination caused by Defendants.

## THIRD CAUSE OF ACTION
### Continuing Trespass

200.   The State of Wisconsin incorporates by reference the allegations in the preceding paragraphs of the Complaint.

201.   The State owns, leases, occupies, and controls real property throughout Wisconsin, including property rights relating to groundwater and surface waters.

202.   The State also has significant possessory interests and property rights in the natural resources of Wisconsin. These rights and interests include—but are not limited to—the State's public trust and *parens patriae* authority in protecting such natural resources from contamination and injury.

203. In its *parens patriae* capacity, moreover, the State seeks relief for the invasion of its citizens' private possessory interests by PFAS contamination.

204. Defendants intentionally caused PFAS contamination to enter the property and natural resources throughout Wisconsin by designing, marketing, developing, distributing, selling, manufacturing, releasing, supplying, using, and/or disposing of PFAS Products—all while knowing to a substantial certainty that the intended use of these PFAS Products would result in widespread PFAS contamination in Wisconsin.

205. Among other things, each Defendant is a substantial factor in causing PFAS contamination to intrude on the state-owned property, property owned by the State's citizens, and natural resources throughout the State as follows:

   a. Defendants designed, manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce PFAS Products that were delivered into the State and areas affecting property and natural resources throughout Wisconsin, when they knew or reasonably should have known: (i) PFAS would be released readily into the environment during the normal, intended, and foreseeable uses of PFAS Products; (ii) when released, PFAS would persist in the environment and not break

71

down; and (iii) PFAS would contaminate State natural resources and property, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies.

b. Defendants disposed of PFAS Products in landfills or through other methods, when they knew or reasonably should have known: (i) PFAS would be released readily into the environment through the disposal process; (ii) when released, PFAS would persist in the environment and not break down; and (iii) PFAS would contaminate property and natural resources located throughout Wisconsin, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies.

c. Defendants spilled, leaked, released, or otherwise caused the discharge of PFAS Products into the environment, when they knew or reasonably should have known: (i) their conduct would readily release PFAS into the environment; (ii) when released, PFAS would persist in the environment and not break down; and (iii) PFAS would contaminate property and natural resources located throughout Wisconsin, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies.

d. Defendants failed (i) to adequately test and investigate the dangers posed by their PFAS Products; (ii) to provide adequate

warnings about the health and environmental risks posed by PFAS; (iii) to provide adequate instructions as to the handling, use, and/or disposal of PFAS Products; and/or (iv) to take any other reasonable, precautionary measures to prevent or mitigate PFAS contamination.

e. Defendants affirmatively misrepresented the hazards of PFAS in their product information, product instructions, promotional materials, and public statements, and/or failed to provide adequate warnings about the health and environmental risks posed by PFAS.

206. Defendants are therefore a direct and proximate cause of PFAS contamination invading the real property and natural resources located throughout Wisconsin.

207. PFAS contamination of the property and natural resources in Wisconsin constitutes a continuing trespass because there exist reasonable, cost-effective methods for treating, remediating, removing, and/or abating that contamination. In addition, because PFAS contamination continues to move and spread throughout Wisconsin, and because PFAS levels at any given contamination site vary over time, PFAS contamination represents an ongoing, repeated, and harmful disturbance of possessory interests and rights in property and natural resources. As long as property and natural resources

remain contaminated due to Defendants' conduct, the trespass continues and is ongoing.

208. The State never authorized, permitted, or consented to Defendants' invasion of its property and natural resources with PFAS.

209. As a direct and proximate result of this trespass, the State has incurred, is incurring, and will continue to incur investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to PFAS contamination of the State's natural resources and property.

210. As a further direct and proximate result of Defendants' trespass, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

211. Defendants' trespassing acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

212. The State is entitled to damages and equitable relief requiring Defendants to take such action as may be necessary to abate the injurious PFAS contamination caused by Defendants.

## FOURTH CAUSE OF ACTION
### Negligence

213. The State of Wisconsin incorporates by reference the allegations in the preceding paragraphs of the Complaint.

214. Defendants owed a duty of care to all parties foreseeably injured by their PFAS Products.

215. Defendants breached that duty of care by negligently designing, formulating, testing, manufacturing, marketing, promoting, selling, distributing, using, and/or disposing of PFAS Products—all while knowingly concealing and misrepresenting the unreasonable dangers posed by those products.

216. Defendants knew or reasonably should have known that (i) the use of PFAS Products in their intended manner would result in the discharge, disposal, or release of PFAS into the environment; (ii) PFAS are highly soluble in water, very mobile, and extremely persistent in the environment; (iii) when released, PFAS would contaminate property and natural resources located throughout the State, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies; (iv) PFAS posed substantial risks to human health and the environment; and (v) ultimately, PFAS would be difficult and costly to remove.

217. Defendants' PFAS Products were unreasonably dangerous for their foreseeable uses and misuses because, among other things:

    a. PFAS Products cause extensive and persistent contamination of groundwater, surface waters, soils, sediments, and biota, even when those products are used in their foreseeable and intended manner.

    b. PFAS Products pose grave threats to public health, economic welfare, and the environment.

    c. It is difficult and costly to treat, remove, and/or remediate PFAS contamination from the environment.

218. At all times relevant to this action, the dangers posed by PFAS Products were not contemplated by ordinary consumers, the public, or the State. Defendants had superior knowledge of those dangers and were in the best position to eliminate, reduce, or mitigate PFAS-related hazards.

219. Despite their sophisticated knowledge of the harms caused by PFAS Products, Defendants breached their duty of care by, among other things:

    a. Failing to adequately warn consumers, the public, and the State of the risks and harms posed by PFAS;

    b. Failing to adequately instruct consumers and users on safe methods for handling, using, and disposing of PFAS Products in

ways that would have eliminated or reduced PFAS discharges to the environment;

c. Failing to provide adequate precautions regarding the hazards of PFAS in their labeling of PFAS Products;

d. Publicly downplaying the dangers posed by PFAS Products;

e. Disseminating false and misleading statements about the adverse health and environmental impacts of PFAS Products;

f. Failing to adequately investigate the dangers posed by PFAS Products;

g. Failing to investigate and develop safer alternative designs of their PFAS Products, including both PFAS-free designs and designs that would reduce or eliminate the adverse health and environmental dangers of PFAS;

h. Failing to adopt available alternative designs that were feasible, reasonable, and safer, including PFAS-free designs and designs that reduced or eliminated the adverse health and environmental dangers of PFAS;

i. Failing to implement reasonable manufacturing practices and process that would reduce or eliminate direct discharges of PFAS to the environment;

j. Failing to implement reasonable handling and disposal practices and processes that would reduce or eliminate direct discharges of PFAS to the environment;

k. Failing to take reasonable, adequate, and sufficient action to eliminate, correct, or remedy PFAS contamination after it occurred; and/or

l. Failing to adequately protect the consumers, the public, the environment, and the State of Wisconsin from foreseeable dangers posed by PFAS Products.

220. These and other negligent acts by Defendants were a direct and proximate cause of widespread PFAS contamination in Wisconsin.

221. These harms to property and natural resources located in Wisconsin far exceed the costs that Defendants would have incurred to adequately guard against the dangers posed by their PFAS Products.

222. Defendants knew with substantial certainty that their negligent acts and omissions would contaminate property and natural resources located throughout Wisconsin. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the dangerous and reasonably foreseeably consequences of that conduct on public health, welfare, and the environment. Therefore, Plaintiff requests an award of punitive damages in an

amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

## FIFTH CAUSE OF ACTION
### Strict Products Liability – Failure to Warn

223.  The State of Wisconsin incorporates by reference the allegations in the preceding paragraphs of the Complaint.

224.  At all times relevant to this Complaint, Defendants were engaged in the business of manufacturing and selling PFAS Products.

225.  As manufacturers of PFAS Products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew or should have known about. Defendants' duty to warn extended to all third parties—including the State and its citizens—who might be foreseeably harmed by the ordinary use and misuse of their PFAS Products.

226.  Defendants knew or reasonably should have known that (i) the use of PFAS Products in their intended manner would result in the discharge, disposal, or release of PFAS to the environment; (ii) PFAS are highly soluble in water, very mobile, and extremely persistent in the environment; (iii) when released, PFAS would contaminate natural resources and property throughout Wisconsin, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies; (iv) PFAS posed substantial risks to human

health and the environment; and (v) ultimately, PFAS would be difficult and costly to remove.

227.   At all times relevant to this action, the dangers posed by PFAS Products were not contemplated by ordinary consumers, the general public, or the State.

228.   Notwithstanding Defendants' superior knowledge of the risks posed by their PFAS Products, Defendants failed to warn consumers, the public, and the State of those risks; they failed to instruct consumers and users on safe methods for handling, using, and disposing of PFAS Products in ways that would have eliminated or reduced PFAS discharges to the environment; and they failed to provide adequate precautions regarding such hazards in the labeling of their PFAS Products.

229.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of their PFAS Products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

230.   Defendants' inadequate warnings and instructions rendered their PFAS Products defective and not reasonably safe.

231. Defendants' defective warnings rendered their PFAS Products unreasonably dangerous for their foreseeable uses and misuses because, among other things:

  a. PFAS Products cause extensive and persistent contamination of groundwater, surface waters, soils, sediments, and biota, even when those products are used in their foreseeable and intended manner.

  b. PFAS Products pose grave threats to public health, economic welfare, and the environment.

  c. It is difficult and costly to treat, remove, and/or remediate PFAS contamination from the environment.

  d. Defendants affirmatively misrepresented and downplayed the health and environmental dangers posed by their PFAS Products; and/or failed to provide adequate warnings about the health and environmental risks posed by PFAS.

232. Defendants' PFAS Products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those products reached their end user without substantial change in their condition.

233. Defendants' failure to warn proximately caused reasonably foreseeable injuries to the State and its citizens. Consumers and users would have heeded legally adequate warnings about the dangers of PFAS Products.

Had Defendants provided adequate warnings and instructions, their PFAS Products would not have gained widespread acceptance in the marketplace, and third parties would have handled, distributed, used, and disposed of PFAS Products in ways that reduced or eliminated PFAS releases to the environment. In addition, if Defendants adequately warned of the adverse impacts to public health and the environment caused by the ordinary and foreseeable uses and misuses of PFAS Products, the State would have taken measures to avoid or lessen those impacts in Wisconsin.

234. Defendants knew with substantial certainty that their acts and omissions described above would contaminate property and natural resources located throughout Wisconsin. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the dangerous and reasonably foreseeably consequences of that conduct on public health, welfare, and the environment. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

### SIXTH CAUSE OF ACTION
### Strict Products Liability – Design Defect

235. The State of Wisconsin incorporates by reference the allegations in the preceding paragraphs of the Complaint.

236.   At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS Products.

237.   As manufacturers of PFAS Products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons—including the State and its citizens—who might be foreseeably harmed by the ordinary use and misuse of their PFAS Products.

238.   Defendants' PFAS Products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

    a. PFAS Products cause extensive and persistent contamination of groundwater, surface waters, soils, sediments, and biota, even when those products are used in their foreseeable and intended manner.

    b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

    c. Defendants failed to disclose these threats to consumers, the public, and the State, and instead downplayed and misrepresented the dangers posed by their PFAS Products.

239.   At all times relevant to this action, Defendants' PFAS Products were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, the general public, and the State.

240. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS Products. Defendants could have made PFAS Products that did not contain PFAS or could have designed PFAS Products in ways that reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their PFAS Products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

241. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS Products outweighed the cost to Defendants of reducing or eliminating such risk.

242. Defendants' PFAS Products were defectively designed at the time they left Defendants' control, and those products reached their end user without substantial change in their condition.

243. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS Products, the State's property, natural resources, and public health have been injured by widespread and toxic PFAS contamination.

244. Defendants knew with substantial certainty that their acts and omissions described above would contaminate property and natural resources throughout the State. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice,

and with conscious and/or reckless disregard for the dangerous and reasonably foreseeable consequences of that conduct on public health, welfare, and the environment. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, the State of Wisconsin respectfully asks this Court for judgment against Defendants, jointly and severally, and to award the State:

1. Compensatory damages arising from PFAS contamination and injury of property and natural resources, according to proof and including but not limited to:

   a. Natural resource damages;

   b. Loss-of-use damages;

   c. Costs of investigation;

   d. Costs of testing and monitoring;

   e. Costs of providing water from an alternative source, including but not limited to emergency and long-term costs as determined by specific community needs, specifications, and requirements;

   f. Costs of installing and maintaining wellhead and other water treatment;

g. Costs of installing and maintaining a wellhead protection program;

h. Costs of installing and maintaining an early warning system to detect PFAS before it reaches wells;

i. Costs of implementing biomonitoring programs for water, soil, air, and all other impacted environmental media in communities and other areas where surface water and/or groundwater sources have become contaminated by PFAS;

j. Costs to remedy loss of tax revenue for local and state-funded and assisted development;

k. Costs of remediating PFAS from natural resources, including groundwater, surface waters, soils, sediments, and other natural resources;

l. Costs of remediating PFAS contamination at release sites and statewide;

m. Costs of implementing educational outreach in communities and other areas where surface water and/or groundwater sources have become contaminated by PFAS;

n. Costs of remedying losses to impacts in the agricultural industry;

o. Costs of collecting and safely disposing of existing AFFF from sites around the State;

p. Loss of tax revenues and other economic benefits;

q. Costs of designing, implementing, and operating biomonitoring programs and studies and costs to otherwise assess PFAS public health impacts for all residents of the State;

r. Costs for outreach, education, community engagement, and additional public health studies, assessments, and measures; and

s. Any other costs or other expenditures incurred to address PFAS contamination and injury.

2. Injunctive and equitable relief to compel Defendants to abate the continuing nuisance and trespass described above, including in the form of an abatement fund to investigate, remove, treat, remediate, clean up, and otherwise mitigate PFAS contamination in Wisconsin.

3. Punitive damages in an amount to be determined at trial.

4. An award of pre-judgment and post-judgment interest as provided by law.

**THE STATE HEREBY DEMANDS A TRIAL BY A TWELVE-PERSON JURY**

[Signatures On Following Page]

87

Dated: July 20, 2022

JOSHUA L. KAUL
Attorney General of Wisconsin

*Electronically signed by R. Duane Harlow*
R. DUANE HARLOW
Assistant Attorney General
State Bar # 1025622

*Electronically signed by Bradley J. Motl*
BRADLEY J. MOTL
Assistant Attorney General
State Bar # 1074743

*Electronically signed by Sarah C. Geers*
SARAH C. GEERS
Assistant Attorney General
State Bar # 1066948

Post Office Box 7857
Madison, Wisconsin 53707-7857
Tel.: (608) 266-2950
Fax: (608) 294-2907
Email: harlowrd@doj.state.wi.us
        motlbj@doj.state.wi.us
        geerssc@doj.state.wi.us

SHER EDLING LLP

*Electronically signed by Stephanie D. Biehl*
STEPHANIE D. BIEHL

Victor M. Sher (*pro hac vice* forthcoming)
Matthew K. Edling (*pro hac vice* forthcoming)
Stephanie D. Biehl (*pro hac vice* forthcoming)
Timothy R. Sloane (*pro hac vice* forthcoming)
Gretel L. Lee (*pro hac vice* forthcoming)
Quentin C. Karpilow (*pro hac vice* forthcoming)
100 Montgomery Street, Suite 1410
San Francisco, CA 94104

88

Tel:   (628) 231-2500
Fax:  (628) 231-2929
Email: vic@sheredling.com
        matt@sheredling.com
        stephanie@sheredling.com
        tim@sheredling.com
        gretel@sheredling.com
        quentin@sheredling.com

Attorneys for the State of Wisconsin

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

STATE OF WISCONSIN

      *Plaintiff*,

    vs.

3M COMPANY (a/k/a Minnesota Mining and
Manufacturing Company); E. I. DU PONT DE
NEMOURS AND COMPANY; THE
CHEMOURS COMPANY; THE
CHEMOURS COMPANY FC, LLC;
DUPONT DE NEMOURS, INC.; BUCKEYE
FIRE EQUIPMENT COMPANY, KIDDE-
FENWAL, INC.; NATIONAL FOAM, INC.;
TYCO FIRE PRODUCTS, LP;
CHEMGUARD, INC.; AMEREX
CORPORATION; CHEMDESIGN
PRODUCTS, INC.; BASF CORPORATION;
DYNAX CORPORATION; ARCHROMA
U.S., INC.; CARRIER GLOBAL
CORPORATION, UTC FIRE & SECURITY
AMERICAS CORPORATION, INC.,
CLARIANT CORPORATION, AND JOHN
DOE DEFENDANTS 1-20,

      *Defendants*.

Case No. 3:22-cv-00412

(Formerly State of Wisconsin Circuit Court,
Dane County, No. 2022CV001795)


**NOTICE OF REMOVAL**

---

Defendants Tyco Fire Products LP and Chemguard, Inc. (collectively "Tyco" unless identified individually by full name), by and through undersigned counsel, hereby give notice of the removal of this action, pursuant to 28 U.S.C. §§ 1331, 1441(a), 1442(a)(1) and 1446, from the Wisconsin Circuit Court, Dane County, to the United States District Court for the Western District of Wisconsin. As grounds for removal, Tyco and Chemguard allege as follows on personal knowledge as to their own conduct and status and on information and belief as to all other matters:

## PRELIMINARY STATEMENT

1.      Plaintiff State of Wisconsin seeks to hold Defendants liable based on their alleged conduct in designing, manufacturing, marketing, distributing, and/or selling products consisting of or containing per- and polyfluoroalkyl substances ("PFAS").  Those products include aqueous film-forming foam ("AFFF"), which was manufactured by Tyco and certain other Defendants.

2.      Specifically, Plaintiff alleges that Defendants' products, including AFFF, have contained PFAS, including perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), and/or their chemical precursors, and that the use of these products has caused contamination of groundwater, air, sediment, surface water, and drinking water throughout Wisconsin.

3.      At least some of the AFFF that has contributed to the alleged contamination has been manufactured by a select group of suppliers (including Tyco) in accordance with the military's rigorous specifications ("MilSpec AFFF").  Under the federal "government contractor" defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), Tyco is immune from tort liability for its design and manufacture of MilSpec AFFF and its provision of warnings for the product.  Under the federal officer removal statute, 28 U.S.C. § 1442, Tyco is entitled to remove this action in order to have its federal defense adjudicated in a federal forum.  *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 810–15 (3d Cir. 2016).  Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

4.      In addition, Plaintiff seeks, in part, to hold Tyco and other defendants liable for releases of AFFF that allegedly occurred and caused injury to Plaintiff at Fort McCoy, a U.S. Army

2

installation in Monroe County, Wisconsin.  (Exhibit A, Complaint ¶ 144(b)).  Fort McCoy is and

has long been a federal enclave.  "Federal courts have federal question jurisdiction over tort claims

that arise on 'federal enclaves.'"  *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th

Cir. 2006).  Because Plaintiff's claims arose in part on a federal enclave, the claims involve a

federal question, and Tyco is entitled to remove the action under 28 U.S.C. §§ 1331 and 1441(a)

as well.

## BACKGROUND

5.     This action was filed on July 20, 2022, in the Circuit Court of the State of Wisconsin,

Dane County, bearing Case No. 2022CV001795.  Venue is proper in this Court pursuant to 28

U.S.C. §§ 130(b) and 1441(a) because the Circuit Court of the State of Wisconsin, Dane County,

is located within the Western District of Wisconsin.

6.     Tyco Fire Products LP and Chemguard, Inc. have not yet been served with process.

Removal is timely under § 1446(b)(1).

7.     Tyco is not required to notify or obtain the consent of any other Defendant in this

action to remove this action as a whole under § 1442(a)(1).  *See, e.g.*, *Durham*, 445 F.3d at 1253;

*Linden v. Chase Manhattan Corp.*, 1999 WL 518836, at *1 (S.D.N.Y. July 21, 1999); *Torres v.*

*CBS News*, 854 F. Supp. 245, 246 n.2 (S.D.N.Y. 1994).

8.     Plaintiff generally alleges that Defendants, including Tyco, designed, manufactured,

marketed, distributed, and/or sold products, including AFFF, which contain PFAS, including

PFOS, PFOA, and/or their chemical precursors.  (Compl. ¶¶ 5, 52, 141).  Plaintiff alleges that

AFFF "has routinely been used in thousands of fire training exercises at military installations,

civilian airports, local fire departments, and industrial facilities," resulting in contamination of the

soil, groundwater, surface water, and other State-owned property and resources in Wisconsin.  (*Id.* ¶¶ 59, 144, 145).

9.  Plaintiff seeks to recover damages that include restoration and loss-of-use damages, natural resource damages, and the costs of investigating, abating, containing, preventing, treating, removing, and remediating PFAS contamination in Wisconsin.  (*Id.* ¶ 14; Prayer for Relief at 85–87.)  Plaintiff also seeks injunctive relief, punitive damages, and pre- and post-judgment interest.  (*Id.* ¶ 14; Prayer for Relief at 87.)

10.  Plaintiff asserts claims against all Defendants for continuing public nuisance (*id.* ¶¶ 180–189); continuing private nuisance (*id.* ¶¶ 190–199); continuing trespass (*id.* ¶¶ 200–212); negligence (*id.* ¶¶ 213–222); strict products liability – failure to warn (*id.* ¶¶ 223–234); and strict products liability – design defect (*id.* ¶¶ 235–244).

11.  Pursuant to 28 U.S.C. § 1446(d), Tyco is serving a copy of this Notice of Removal upon all other parties to this case and Tyco is filing a copy with the Clerk of the Circuit Court of the State of Wisconsin, Dane County.

12.  By filing a Notice of Removal in this matter, Tyco does not waive the rights of any Defendant to object to service of process, the sufficiency of process, jurisdiction over the person, or venue, and Tyco specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

13.  Tyco reserves the right to amend or supplement this Notice of Removal.

## <u>REMOVAL IS PROPER UNDER THE FEDERAL<br>OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)</u>

14.  Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer.  Removal is appropriate under this provision where the removing

4

defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority; (c) its actions taken pursuant to a federal officer's direction have a causal nexus with plaintiff's claims or injuries or are otherwise related to the lawsuit; and (d) it can assert a "colorable" federal defense. *See Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017); *cf. Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989); *Papp*, 842 F.3d at 812; *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187, 196 (D. Mass. 2008); *Isaacson*, 517 F.3d at 135; *Durham*, 445 F.3d at 1251.

15. Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *see Durham*, 445 F.3d at 1252. To the contrary, § 1442 as a whole must be "liberally construe[d]" in favor of removal. *Papp*, 842 F.3d at 812 (alterations in original) (internal quotation marks omitted).

16. All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's injuries are caused at least in part by MilSpec AFFF. *See, e.g.*, *Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (denying motion to remand in AFFF case against Tyco and other manufacturers and holding that, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims

related to MilSpec AFFF[,] . . . Plaintiffs cannot decide what defense Defendants might present"); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in a lawsuit against Tyco and other manufacturers of MilSpec AFFF). The court overseeing the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation has also found on multiple occasions that removal under § 1442 is proper where the notice of removal alleges that plaintiffs' injuries are caused, at least in part, by MilSpec AFFF. *See* Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 103 (D.S.C. May 24, 2019) ("MDL Order 1"), at 3–6; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) ("MDL Order 2"), at 3–5; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("MDL Order 3"), at 3–6. Given its experience with the claims and defenses in AFFF litigation, the MDL Court's holdings clearly demonstrate that this case, too, has been properly removed to federal court.[1]

A. **MilSpec AFFF**

17. Since the 1960s, the United States military has used MilSpec AFFF on military bases, airfields (including Air National Guard facilities), and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. Indeed, the United States Naval Research Laboratory developed AFFF in response to catastrophic fires aboard the aircraft carriers *USS Forrestal* in 1967 and *USS Enterprise* in 1969.[2]

---

[1] Following removal, Tyco intends to designate this action for transfer to the MDL.

[2] *See* Press Release 71-09r, U.S. Naval Research Lab., Navy Researchers Apply Science to Fire Fighting (Oct. 23, 2009), https://tinyurl.com/y2jq4q4w.

Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[3]

18.    The manufacture and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command.  The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[4]  All MilSpec AFFF products must be qualified for listing on the applicable Qualified Products List prior to military procurement.  Prior to such listing, a manufacturer's products are examined, tested, and approved to be in conformance with specification requirements.[5]  The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.  After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[6]  Naval Sea Systems Command reserves the right to perform any of the quality assurance inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements.

19.    From its inception until very recently, the MilSpec included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants."  All fluorocarbon surfactants are PFAS, and that category includes PFOA, PFOS, and their chemical precursors—the very compounds at

---

[3]  U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

[4]  The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

[5]  Dep't of Defense SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[6] Id.

issue in the Complaint here. This requirement has been in force for virtually the entire time period at issue in the Complaint. In 2019, the MilSpec removed the modifier "fluorocarbon" from "surfactants," but it expressly states that "the DoD intends to acquire and use AFFF with the lowest demonstrable concentrations of . . . PFOS and PFOA" "[i]n the short term." PFOA or PFOS are unavoidably present at some concentrations in fluorocarbon surfactants, and the current MilSpec expressly contemplates that AFFF formulations will contain PFOA and PFOS (subject to recently imposed limits).

20. Part 139 airports are those serving scheduled passenger flights by nine passenger (or larger) aircraft or unscheduled passenger flights by 31 passenger (or larger) aircraft. *See* 14 C.F.R. § 139.1 (2019). The federal government requires Part 139 airports to use MilSpec AFFF. On July 8, 2004, the FAA issued Advisory Circular 150/5210-6D, which stated that "AFFF agents [used by Part 139 airports] must meet the requirements of Mil-F-24385F."[7] Although the preamble indicated that the circular was for guidance only, on February 8, 2006, the FAA issued a CertAlert clarifying that the MilSpec AFFF requirement was, in fact, mandatory and that "[a]ny AFFF purchased after July 1, 2006 by an airport operator certified under Part 139 must meet [Mil-F-24385F]."[8] The FAA explained: On September 1, 2016, the FAA issued a superseding CertAlert, which reiterated that "Airport operators must ensure any AFFF purchased after July 1, 2006, meets Mil-Spec standards."[9] Thus, from July 1, 2006 to present, airport operators holding an FAA Airport Operating Certificate have been required to purchase MilSpec AFFF for use.

---

[7] *See* Advisory Circular 150/5210-6D at 4, Chapter 6, https://tinyurl.com/yxpk87ky.

[8] *See* DOT/FAA/TC-14/22, Impact of Alternative Fuels Present in Airports on Aircraft Rescue and Firefighting Response at 25-26 (Aug. 2014), https://tinyurl.com/rt35dgp.

[9] Federal Aviation Administration, Cert Alert No. 16-05: Update on Mil-Spec Aqueous Film Forming Foam (AFFF) at 2 (Sept. 1, 2016), https://tinyurl.com/ya5pvbkh.

21.     The Complaint alleges that Plaintiff's injuries arose in part from the use and release of AFFF at several U.S. military facilities in Wisconsin:

(a)     Fort McCoy (Compl. ¶ 144(b));

(b)     Truax Field Air National Guard Base in Madison (*id.* ¶ 144(h)); and

(c)     Volk Field Air National Guard Base in Camp Douglas (*id.* ¶ 144(i)).

As military facilities, these installations are and have long been required to use MilSpec AFFF.

22.     In addition, the Complaint alleges that Plaintiff's injuries arose in part from the use and release of AFFF at several Part 139 airports in Wisconsin:

(a)     General Mitchell International Airport in Milwaukee (*id.* ¶ 144(c));

(b)     La Crosse Regional Airport in La Crosse (*id.* ¶ 144(e));

(c)     Rhinelander/Oneida County Airport in Rhinelander (*id.* ¶ 144(g)); and

(d)     Dane County Regional Airport in Madison (*id.* ¶ 144(h)).

Since at least 2006, those airports have used MilSpec AFFF for firefighting and training purposes.

**B.      All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied**

*1.      The "Person" Requirement Is Satisfied*

23.     The first requirement for removal under the federal officer removal statute is satisfied here because Tyco Fire Products LP and Chemguard, Inc. (a limited partnership and corporation, respectively) meet the definition of "persons" under the statute.  For purposes of § 1442(a)(1), the term "person" includes "corporations, companies, associations, firms, [and] partnerships."  *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1); *accord Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010); *Isaacson*, 517 F.3d at 135–36.

9

## 2. *The "Acting Under" Requirement Is Satisfied*

24. The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out, the duties or tasks of a federal officer. *Papp*, 842 F.3d at 812. The phrase "acting under" is to be "liberally construed in favor of the entity seeking removal." *Sawyer*, 860 F.3d at 255 (internal quotation marks omitted). Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813. Rather, "courts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Sawyer*, 860 F.3d at 255 (emphasis in original).

25. The requirement of "acting under" federal office is met here because the effect of Plaintiff's claims, at least in part, is to challenge Tyco's alleged conduct in providing vital products "that, in the absence of Defendants, the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission-critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson*, 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[10] Accordingly, the military has long depended upon outside contractors like Tyco to develop and supply AFFF. *See Chemguard*, 2021 WL 744683, at

---

[10] Fulfilling the Roosevelts' Vision, *supra* n.3, at 37.

*3 (holding that Tyco and other AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same); *see also* MDL Order 1, at 3–6 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); MDL Order 2, at 3–5; MDL Order 3, at 3–6 (same). If Tyco and other manufacturers did not provide MilSpec AFFF, the government would have to manufacture and supply the product itself.

26.     In designing, manufacturing, and supplying the MilSpec AFFF at issue, Tyco acted under the direction and control of one or more federal officers. Specifically, Tyco acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, the AFFF products in question were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[11]

### 3.      *The Nexus Requirement Is Satisfied*

27.     The third requirement, that the defendant's actions taken under color of federal office have a causal nexus with plaintiff's claims or injuries or be otherwise related to the lawsuit, erects a hurdle that "is quite low." *Isaacson*, 517 F.3d at 137.[12] To show the required nexus, it is sufficient for a defendant to establish a connection or association between the lawsuit and the federal office. *Sawyer*, 860 F.3d at 258.

---

[11] *See* Dep't of Defense, SD-6, *supra* n.5, at 1.

[12] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

28.    Here, Plaintiff's claims arise, at least in part, from Tyco's production and sale of AFFF manufactured to military specifications.  Plaintiff alleges that the use of PFAS in AFFF is a source of its injuries.  Tyco contends that the use of such chemicals in MilSpec AFFF was required by military specifications.  The conflict is apparent: MilSpec AFFF was developed by Tyco, and other manufacturers to meet specifications established by the DoD.  The design choices Plaintiff is attempting to impose via state tort law would create a conflict in which Tyco could not comply with both the MilSpec and the purported state-prescribed duty of care.  *See Boyle*, 487 U.S. at 509; *see also Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'causal connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government."); MDL Order 1, at 5–6 ("Here, [Plaintiff]'s claims arise out of use of AFFF products that it claims Tyco manufactured and sold, and for which the U.S. military imposes MilSpec standards.  The Court . . . finds that the causation element of federal officer removal is satisfied here."); MDL Order 2, at 5 (finding the causation element of federal officer removal satisfied where Tyco's AFFF products, "for which the military imposes MilSpec standards," were used at several airports); MDL Order 3, at 5–6 (same as to MilSpec AFFF used at a single airport).

29.    Here, Plaintiff's purported injuries arise, at least in part, from MilSpec AFFF.  The causal connection or relationship between Plaintiff's alleged injuries and Tyco's actions under color of federal office is clear.  It is irrelevant that the Complaint does not expressly contend that Plaintiff has been injured by MilSpec AFFF.  Courts "credit Defendants' theory of the case when determining whether [the] causal connection exists."  *Isaacson*, 517 F.3d at 137; *see also Chemguard*, 2021 WL 744683, at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present").

12

### 4. *The "Colorable Federal Defense" Requirement Is Satisfied*

30.    The fourth requirement ("colorable federal defense") is satisfied by Tyco's assertion of the government contractor defense.

31.    At the removal stage, a defendant need only show that its government contractor defense is colorable, *Sawyer*, 860 F.3d at 254; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original) (citation omitted).  "A defendant 'need not win his case before he can have it removed.'" *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." (citation omitted)); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 54 (D. Mass. 2008) (upon removal, defendant must raise "colorable federal defense").  At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116.[13] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

32.    Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved

---

[13] *See also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage.  Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense." (internal citation omitted)).

reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

33.     Tyco has satisfied these elements for purposes of removal.  As discussed above, Naval Sea Systems Command approved reasonably precise specifications, governing MilSpec AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.  Tyco's products appeared on the DoD Qualified Products List, which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec.  *See Ayo*, 2018 WL 4781145, at *13 ("[T]here is colorable evidence that Manufacturing Defendants' Mil-Spec AFFF is not a stock product and that the government approved reasonably precise specifications requiring them to use PFCs, including PFOS and PFOA, in their products."); *see also id.* ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); MDL Order 1, at 5 (finding defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications"); MDL Order 2, at 4 (same, as to Tyco); MDL Order 3, at 5 (same); *see also Chemguard*, 2021 WL 744683, at *4.

34.     Moreover, the government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF.  The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand.  Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human health

14

issues.[14]  For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from fire fighting exercises are considered to have adverse effects environmentally."[15]  By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."  In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to alleged associations between PFOA and cancer.  More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[16]  Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants," and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[17]  *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the

---

[14] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1–6 (Nov. 4, 2002).

[15] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[16] Dep't of Defense, *Aqueous Film Forming Foam Report to Congress* 1–2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[17] *See* MIL-PRF-24385F(SH), Amendment 4, § 6.6 & Tables I, III (2020), https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=17270; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

claimed defective design."); MDL Order 1, at 5 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . .").

35.     At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks.  *See Twinam v. Dow Chem. Co. (In re "Agent Orange" Prod. Liab. Litig.)*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'" (citation omitted)).  Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies.  *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

36.     Tyco's use of PFAS in MilSpec AFFF was required by military specifications.  By seeking to impose tort liability on Tyco for alleged injuries to Plaintiff that were caused in whole or in part by Tyco's compliance with military specifications, Plaintiff is attempting to use state tort law to attack design choices dictated by the military.  The government contractor defense precludes such an attack.  *See Boyle*, 487 U.S. at 509.

### IN ADDITION, BECAUSE PLAINTIFF'S CLAIMS AROSE IN PART ON A FEDERAL ENCLAVE, THIS COURT HAS JURISDICTION UNDER 28 U.S.C. § 1331, AND REMOVAL IS PROPER UNDER 28 U.S.C. § 1441(a).

37.     Removal of this action is also proper because Plaintiff's claims arose in part on a federal enclave.  To that extent, the claims are governed by federal law and are subject to this

Court's original jurisdiction under 28 U.S.C. § 1331.  Thus, this action is removable under 28 U.S.C. § 1441(a).

38.    "A federal enclave is a portion of land over which the United States government exercises federal legislative jurisdiction."  *Brookhaven Sci. Assocs., LLC v. Donaldson*, 2007 WL 2319141, at *5 (S.D.N.Y. Aug.9, 2007) (internal quotation and citation omitted).

39.    Fort McCoy is, and has long been, a federal enclave.  *See, e.g.*, *United States v. Devenport*, 131 F.3d 604 (7th Cir. 1997); *see also* Wis. Stat. § 1.02(2) (confirming that the State has consented to the United States' acquisition of the tracts comprising Fort McCoy and that the United States has exclusive jurisdiction over that property).  As noted above, the Complaint alleges that Plaintiff's injuries arose at least in part from the use and release of AFFF at Fort McCoy.

40.    The Constitution confers on Congress the power "[t]o exercise exclusive legislation" over the District of Columbia "and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."  U.S. Const. art. I, § 8, cl. 17.  "It long has been settled that, where lands for such a purpose are purchased by the United States with the consent of the State legislature, the jurisdiction theretofore residing in the state passes, in virtue of the constitutional provision, to the United States, thereby making the jurisdiction of the latter the sole jurisdiction."  *Surplus Trading Co. v. Cook*, 281 U.S. 647, 652 (1930).  Because the United States exercises sole lawmaking authority over a federal enclave, the law applicable to that enclave is by definition federal law, although such federal law may incorporate state-law rules of decision. *See, e.g.*, *Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952) ("[A]ny law existing in territory over which the United States has 'exclusive' sovereignty must derive its authority and force from the United States and is for that reason federal law"); *accord Macomber v. Bose*, 401 F.2d 545, 546

4878-1834-0908.2

(9th Cir. 1968) ("State law theretofore applicable within the [ceded] area was assimilated as federal law, to remain in effect until changed by Congress. Rights arising under such assimilated law, arise under federal law and are properly the subject of federal jurisdiction."); *Brookhaven Sci. Assocs.,* 2007 WL 2319141, at *5 ("[W]hen an area becomes a federal enclave, the state law in effect at the time of cession becomes federal law and is the applicable law unless Congress provides otherwise.").

41. Accordingly, federal courts have federal-question jurisdiction under 28 U.S.C. § 1331 as to actions involving tort claims that arise on federal enclaves. *See, e.g.*, *Durham*, 445 F.3d at 1250; *Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998). It follows that such actions, if originally filed in state court, may be removed to federal court under 28 U.S.C. § 1441(a). *See, e.g.*, *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1236 (10th Cir. 2012); *Fuller v. Tenn. Valley Auth.*, 2007 WL 2077639 at *2 (E.D. Tenn. 2007).

42. Because Plaintiff's claims arose in part on a federal enclave, namely Fort McCoy, this Court has original jurisdiction over the action, and removal of the action is proper under 28 U.S.C. § 1441(a). *See* MDL Order 1 at 3-4 (upholding removal, based on federal enclave jurisdiction, of PFAS action brought by the State of New York);

\*\*\*

WHEREFORE, Tyco hereby removes this action from the Circuit Court of the State of Wisconsin, Dane County, to this Court.

18

RESPECTFULLY SUBMITTED this 27th day of July, 2022.

By: <u>Electronically *signed by Bryan T. Mette*</u>
    Bryan T. Mette WBN 1125800
    Foley & Lardner LLP
    150 E. Gilman St., Suite 5000
    Madison, WI 53703
    Phone: (608) 258-4292
    Fax: (608) 258-4258
    bmette@foley.com

    Matthew D. Krueger WBN 1096923
    Foley & Lardner LLP
    777 E. Wisconsin Ave.
    Milwaukee, WI 53202
    Phone: (414) 297-4987
    Fax: (414) 297-4900
    mkrueger@foley.com

    *Counsel for Tyco Fire Products, LP and*
    *Chemguard, Inc.*

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| STATE OF WISCONSIN<br><br>                    Plaintiff,<br><br>        v.<br><br>3M COMPANY (a/k/a Minnesota Mining and Manufacturing Company); E. I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; DUPONT DE NEMOURS, INC.; BUCKEYE FIRE EQUIPMENT COMPANY, KIDDE-FENWAL, INC.; NATIONAL FOAM, INC.; TYCO FIRE PRODUCTS, LP; CHEMGUARD, INC.; AMEREX CORPORATION; CHEMDESIGN PRODUCTS, INC.; BASF CORPORATION; DYNAX CORPORATION; ARCHROMA U.S., INC.; CARRIER GLOBAL CORPORATION, UTC FIRE & SECURITY AMERICAS CORPORATION, INC., CLARIANT CORPORATION, AND DOE DEFENDANTS 1-20,<br><br>                    Defendants. | Case No. 3:22-cv-00412 |

## MOTION OF DEFENDANTS TYCO FIRE PRODUCTS LP AND CHEMGUARD, INC. TO STAY THIS ACTION PENDING TRANSFER DECISION BY THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

Defendants Tyco Fire Products, LP and Chemguard, Inc. respectfully move the Court to stay this action pending a decision by the Judicial Panel on Multidistrict Litigation on whether to transfer this action to the *In re Aqueous Film-Forming Foams (AFFF) Products Liability Litigation* pending in the District of South Carolina (the "MDL Court").

The grounds for this Motion are detailed in the accompanying memorandum of law in support.

Counsel for Defendants Tyco Fire Products, LP and Chemguard, Inc. are authorized to represent that all other Defendants in this action consent to the relief sought in this Motion.

Dated:  August 18, 2022

/s/ Bryan T. Mette
Bryan T. Mette, WI Bar No. 1125800
Foley & Lardner LLP
150 E. Gilman St., Suite 5000
Madison, WI 53703
Phone: (608) 258-4292
Fax: (608) 258-4258
bmette@foley.com

Matthew D. Krueger, WI Bar No. 1096923
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202
Phone:  (414) 271-2400
Facsimile:  (414) 297-4900
mkrueger@foley.com

*Attorneys for Defendants Tyco Fire Products, LP and Chemguard, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

STATE OF WISCONSIN,

     *Plaintiff*,

vs.

3M COMPANY, et al.,

     *Defendants*.

**Case No. 3:22-cv-00412-wmc**

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS TYCO FIRE PRODUCTS LP AND CHEMGUARD, INC. TO STAY THIS ACTION PENDING TRANSFER DECISION BY THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

## I.  INTRODUCTION

This action is one of thousands of related lawsuits that have been brought against manufacturers of aqueous film-forming foams ("AFFF") by plaintiffs (including numerous States) asserting claims for property damage, personal injury, natural resource damages, or other harms from certain chemicals—per- and polyfluoroalkyl substances ("PFAS")—contained in AFFF.  The vast majority of those cases have been centralized in a multidistrict litigation proceeding in the District of South Carolina, *In re Aqueous Film-Forming Foams (AFFF) Products Liability Litigation* (the "MDL" or "AFFF MDL").  Shortly after Defendants Tyco Fire Products LP and Chemguard, Inc. (collectively, "Tyco") removed this case from state court to this Court, the Judicial Panel on Multidistrict Litigation ("JPML") issued a conditional transfer order ("CTO") identifying the action as appropriate for transfer to the MDL.

Plaintiff has objected to that CTO.  That objection will occasion a round of briefing on the matter before the JPML, and the JPML will most likely issue a ruling shortly after its December 1 hearing session.  But given the Complaint's express allegations that Plaintiff's alleged injuries

arise at least in part from the use of AFFF, *e.g.*, ECF No. 1-1 (Complaint) ¶¶ 5, 59, 144,[1] this case falls squarely within the scope of the MDL, and it is virtually certain that the JPML will order transfer. Plaintiff has also stated in a recent filing[2] that it intends to move in this Court to remand the case to state court, notwithstanding the fact that the MDL court has addressed (and rejected) motions to remand involving the identical issues.

Because the JPML is almost certain to transfer this case to the MDL, Tyco, with the express consent of all of the other Defendants, requests that the Court stay all proceedings in this action— including briefing and decision on Plaintiff's promised motion to remand—until the JPML issues its decision on transfer.[3] Courts in other AFFF cases have stayed proceedings to await the JPML's decision on transfer, notwithstanding the pendency (or prospective filing) of a motion to remand. *See Marathon Petroleum Co. LP v. 3M Co.*, 2022 WL 821667 (E.D. Mich. Mar. 17, 2022); *Tibbetts v. 3M Co.*, 2022 WL 252685 (E.D. La. Jan. 27, 2022); *Saracco v. State of Alaska*, 2021 WL 5567417 (D. Alaska Nov. 29, 2021); *Gaston v. State of Alaska*, 2021 WL 5567419 (D. Alaska Nov. 29, 2021). A stay is warranted here. Tyco properly removed this case, and the MDL court has upheld removal in essentially identical circumstances multiple times. If, despite that precedent, Plaintiff wishes to contest jurisdiction, it should do it in the MDL court. The balance of interests here favors a stay: the requested stay will be of brief duration; will conserve judicial resources and ensure consistent rulings on common issues; will not prejudice Plaintiff; and will avoid prejudice to Tyco and the other Defendants. The MDL court is well-positioned to address

---

[1] Unless otherwise noted, all cites to ECF are to this Court's docket in this case.

[2] *See* ECF No. 5 (Stipulation to Extend Time) at 2 (¶ 3).

[3] On the parties' stipulation, the Court has already deferred Defendants' obligation to respond to the Complaint pending rulings on transfer and remand. ECF No. 5 (Stipulation to Extend Time); ECF No. 6 (text order accepting stipulation).

all pretrial matters, including Plaintiff's motion to remand, after transfer. In the (unlikely) event that the JPML denies transfer, this Court can take up the issue of remand then.

## II. **BACKGROUND**

### A. The AFFF MDL

AFFF is a highly effective firefighting agent that quickly extinguishes liquid fuel fires. It is essential in military settings, and since 1969, manufacturers have produced AFFF pursuant to a detailed military specification ("MilSpec") issued by a unit of the U.S. Navy on behalf of the Department of Defense ("DoD"). ECF No. 1 (Notice of Removal) ¶ 18. Litigants have generally referred to that class of products as "MilSpec AFFF." The chemical components that give AFFF its superior fire-suppression features are various types of fluorocarbon surfactants. Those surfactants are all part of the family of PFAS compounds. *Id.* ¶ 19. Until 2019, the MilSpec expressly required the use of fluorocarbon surfactants in AFFF, and even today AFFF cannot meet other requirements of the MilSpec without such surfactants. *Id.* MilSpec AFFF is required to be stocked and used on Navy ships and military bases and, since at least 2006, at larger civilian airports (so-called "Part 139" airports). *Id.* ¶¶ 17-18, 20. "Commercial" AFFF—not made to military specifications but also containing fluorinated surfactants—is used in various other settings. *See Nessel v. Chemguard, Inc.*, 2021 WL 744683, at *1 (W.D. Mich. Jan. 6, 2021).

Beginning in 2016, AFFF manufacturers and other firms in the supply chain began to face numerous product-liability actions alleging harms from PFAS in AFFF, including fluorocarbon surfactants that allegedly contain or can degrade into other PFAS such as perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"). The JPML established the AFFF MDL in December 2018 to coordinate pretrial proceedings in all such cases in the federal system. The JPML noted that such cases involve common factual questions, including "the toxicity of PFOA

and PFOS and their effects on human health; the chemical properties of these substances and their propensity to migrate in groundwater supplies; the knowledge of the AFFF manufacturers regarding the dangers of PFOA and PFOS; their warnings, if any, regarding proper use and storage of AFFFs; and to what extent, if any, defendants conspired or cooperated to conceal the dangers of PFOA and PFOS in their products." *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1394 (J.P.M.L. 2018). The JPML also found that an MDL was appropriate because "the AFFF manufacturers likely will assert identical government contractor defenses in many of the actions" involving use of AFFF made to military specifications. *Id.*

The MDL, under the supervision of the Honorable Richard M. Gergel of the District of South Carolina, currently encompasses over 2,000 cases, including actions similar to this one brought by the States of Alaska, Colorado, Massachusetts, Michigan, Mississippi, New York, New Jersey, New Hampshire, North Carolina, Ohio, and Vermont. Since the MDL was formed, Judge Gergel has ruled on a host of issues, including several motions to remand, denying them in each instance. The parties in the MDL recently finished briefing Defendants' motion for partial summary judgment on their government contractor defense, and Judge Gergel will hear argument on the motion on August 19.

**B. Procedural History Of This Action**

Plaintiff filed this action on July 20, 2022 in the Circuit Court for Dane County. The Complaint generally alleges that PFAS, including PFOA and PFOS, from AFFF and other products manufactured by the Defendants have been released into the environment and caused contamination at various locations within the State of Wisconsin, including several specifically identified military facilities and Part 139 airports. ECF No. 1-1 (Complaint) ¶¶ 1-14, 144. Plaintiff

seeks compensation for the cost of investigating and remediating the alleged contamination, natural resource damages, and other alleged harms. *Id.* ¶ 14 & pp. 85-87 (Prayer for Relief).

On July 27, Tyco removed the action to this Court, invoking both the federal officer removal statute, 28 U.S.C. § 1442(a)(1), and the federal question statute, 28 U.S.C. § 1331. ECF No. 1 (Notice of Removal). Removal under Section 1442(a)(1) is proper where a defendant has acted under federal authority, its actions under federal authority are related to Plaintiff's claims, and it can assert a "colorable" federal defense to those claims. *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180-81 (7th Cir. 2012). The Notice of Removal sets forth facts alleging that those requirements are met here: Plaintiff's claims arise in part from the use of AFFF at several military installations and Part 139 airports, and the AFFF used at those facilities is required to be MilSpec AFFF. In manufacturing AFFF pursuant to the MilSpec, which expressly or effectively requires the use of PFAS in the product, Tyco has acted under a federal authority; its acts under federal authority are related to this case; and it has a colorable federal defense to Plaintiff's claims, namely, the "government contractor" defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). ECF No. 1 (Notice of Removal) ¶¶ 3, 23-36. Numerous courts in AFFF cases have recognized that removal under Section 1442(a)(1) is appropriate where the plaintiff's claims arise at least in part from the use of MilSpec AFFF. That includes both the MDL court, *In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at *1-3 (D.S.C. May 24, 2019) ("*AFFF I*"); Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) at 3–5 ("*AFFF II*") (**Exhibit 1**); Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) at 3–6 ("*AFFF III*") (**Exhibit 2**); and other courts, *Nessel v. Chemguard, Inc.*, 2021 WL 744683 ((W.D. Mich. Jan. 6, 2021); *Ayo v. 3M Co.*, 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (decided before formation of MDL).

Removal is also proper under Section 1331.  One of the sites of AFFF use and a source of PFAS contamination identified in the Complaint is Fort McCoy, ECF No. 1-1 (Complaint) ¶ 144(b), a U.S. Army installation that is and has long been a federal enclave, ECF No. 1 (Notice of Removal) ¶¶ 4, 39.  "Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'"  *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006).  Because Plaintiff's claims arise in part from activity on a federal enclave, the claims involve a federal question, and Tyco is entitled to remove and litigate this action in federal court under 28 U.S.C. §§ 1331 and 1441(a) as well.  *See In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at *3-4.

After removing the case, Tyco filed a tag-along notice in the JPML identifying the case as appropriate for transfer to the MDL. *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2873, ECF 1502-1. The JPML issued a CTO on August 3, 2022.  *Id.* ECF. No. 1512.  Plaintiff filed a notice of opposition to transfer on August 10.  *Id.* ECF No. 1529.  The JPML has issued a briefing schedule under which Plaintiff's opening brief is due August 25.  Defendants' brief is due September 15, and Plaintiff's reply is due September 22.  *Id.* ECF. No. 1533.  The JPML will likely decide the issue shortly after its hearing session on December 1.[4]

Notwithstanding Plaintiff's opposition, it is all but certain that the JPML will order transfer. The JPML has explained that it "will not exclude any of the AFFF actions from the MDL." *In re AFFF*, 357 F. Supp. 3d at 1395.  And this is clearly an "AFFF action," because on the face of the

---

[4]  Although the JPML's next hearing session is September 29, we are advised by the JPML Clerk's office that because the briefing in this case will not close until shortly before that date, this case will be placed on the calendar for the Panel's next session, which is December 1.  *See* https://www.jpml.uscourts.gov/hearing-information.  In other AFFF cases involving disputed CTOs, the JPML has almost always ruled within a week after the hearing session for which the matter is calendared.

Complaint Plaintiff's claims expressly relate in part to the use of PFAS-containing AFFF. ECF No. 1-1 (Complaint) ¶¶ 59, 144. Indeed, many of the Defendants in the case are sued solely in their capacity as manufacturers of AFFF. *Id.* ¶¶ 27-33, 35, 38-39. The fact that Plaintiff also alleges injury from PFAS in products other than AFFF is irrelevant to transfer. The JPML has rejected the argument that cases should be excluded from the MDL because they allege injury from sources of PFAS *in addition* to AFFF. Transfer Order at 2, *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2873 (J.P.M.L. June 5, 2019) (ECF No. 446). Moreover, this action implicates several of the common issues that the JPML identified as justifying the creation of the MDL. *See* 357 F. Supp. 3d at 1394. Those issues include the chemical properties of PFOA, PFOS, and other PFAS and their propensity to migrate in groundwater supplies; AFFF manufacturers' knowledge of the alleged dangers of PFAS; and their warnings regarding proper use and storage of AFFFs. *See, e.g.*, ECF No. 1-1 (Complaint) ¶¶ 6-7, 60, 83-140, 144. The government contractor defense is also at issue here as to a number of sites addressed in the Complaint. *See infra* at 12-13.

## III. <u>ARGUMENT</u>

It is well-established that a trial court's power to stay proceedings is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). Courts regularly exercise that power to stay proceedings where, as here, a case will likely be transferred to an MDL. The rationale is straightforward: If the case is likely to be transferred in the near term, it makes no sense for the parties and the transferor court to expend time and effort on pretrial proceedings in that court. Once the case is transferred, the MDL court can address the pretrial matters presented in that case and all similar cases in the MDL, thereby

preserving judicial resources, ensuring consistent decisions, and avoiding the risk of inconsistent outcomes.

The Western District of Wisconsin and other district courts within the Seventh Circuit have repeatedly recognized this principle and stayed proceedings until the JPML decides whether to transfer an action to an MDL—even when there is a pending motion to remand that challenges the court's jurisdiction. *See, e.g.*, *Uhle v. DePuy Orthopaedics, Inc.*, 2021 WL 6622512 (N.D. Ill. Nov. 19, 2021); *Bad River Band of Lake Superior Chippewa v. Purdue Pharma L.P.*, 2019 WL 252026 (W.D. Wis. Jan. 17, 2019); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. McKesson Corp.*, 2018 WL 2390120 (W.D. Wis. May 25, 2018); *Estate of Hoholek v. AbbVie, Inc.*, 2014 WL 7205586 (N.D. Ind. Dec. 17, 2014); *Meyers v. Bayer AG*, 143 F. Supp. 2d 1044 (E.D. Wis. 2001); *Weinke v. Microsoft Corp.*, 84 F. Supp. 2d 989 (E.D. Wis. 2000).

When presented with a motion to stay a case pending a JPML decision on transfer while a motion to remand is also pending,[5] courts in this District follow a three-step analysis adopted from *Meyers*, 143 F. Supp. 2d at 1048-49. That analysis considers whether a "preliminary assessment" of the jurisdictional issue suggests removal was improper; and whether similar jurisdictional issues have been raised in other cases in the MDL. If it appears that removal was proper—or, at least that the arguments against federal jurisdiction issues are difficult—and that similar issues have been or may be raised in cases within the MDL, then the court considers the traditional factors relevant to issuance of a stay: the interests of judicial economy; prejudice to the moving party if the action is not stayed; and potential prejudice to the non-moving party from a stay. *Bad River Band*, 2019 WL 252026, at *1-2; *Lac Courte Oreilles Band*, 2018 WL 2390120, at *1-2.

---

[5] Although Plaintiff has not yet filed a motion to remand, it has declared that it intends to do so, and we assume that it will file that motion during the pendency of this Motion to Stay.

In this case, each of these factors favors the issuance of a stay pending the JPML's decision on transfer.

## A. Tyco Properly Removed this Action.

### 1. Removal Is Proper under the Federal Officer Removal Statute.

Removal rights under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), are much broader than under the general removal statute, 28 U.S.C. § 1441. Although Section 1441 is construed narrowly, the Supreme Court and the Seventh Circuit have directed that 28 U.S.C. § 1442(a)(1) must be "liberally construed" in favor of removal. *Hammer v. U.S. Dep't of Health & Hum. Servs.*, 905 F.3d 517, 527 (7th Cir. 2018) (quoting *Watson v. Philip Morris Co.*, 551 U.S. 142, 147 (2007)). Suits against private defendants acting under the direction of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 431 (1999)). In other words, the "well-pleaded complaint" rule does not apply to cases removed based on federal officer jurisdiction. *E.g., Hammer*, 905 F.3d at 525; *Ruppel*, 701 F.3d at 1180. The factual allegations supporting removal may be—and typically are—supplied by the defendant's averments in the notice of removal. *See Acker*, 527 U.S. at 431. Section 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prod.*, 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted). Removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008). That important federal policy "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

Courts review a defendant's allegations in a "§ 1442 notice of removal under the federal pleading standards." *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009)). Unless the plaintiff comes forward with specific evidence controverting the factual allegations in the notice of removal, the court must resolve the jurisdictional challenge "as it would a motion to dismiss under Rule 12(b)(6): Accepting [the removing party's] allegations as true and drawing all reasonable inferences in [that party's] favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). If the federal defense colorably applies to *any* claim—or portion of a claim—in a case, the entire action is removable. *Ruppel*, 701 F.3d at 1182.

Each of the three requirements for removal under § 1442(a)(1), *see Ruppel*, 701 F.3d at 1180-81, is satisfied here.

### a.   In Manufacturing MilSpec AFFF, Tyco Has Acted Under Federal Authority.

The requirement in Section 1442(a)(1) that the removing defendant "act under" federal authority is liberally construed. *Ruppel*, 701 F.3d at 1181. That requirement is readily met when the defendant is a federal contractor that manufactures a product specifically for the government. "When a private entity is involved, the Supreme Court has interpreted the phrase 'acting under' to contemplate a relationship where the government exerts some 'subjection, guidance, or control,' and where the private entity engages in an effort 'to assist, or to help carry out, the duties or tasks of the federal superior.'" *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) (quoting *Watson*, 551 U.S at 151–52)) (internal citations omitted). "Accordingly, courts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it manufactured for the government." *Id.*

Here, the Notice of Removal alleges facts showing that that Tyco has manufactured and supplied MilSpec AFFF under the direction and control of federal officers.  Specifically, Tyco has acted in accordance with detailed specifications, promulgated by a unit of the U.S. Navy on behalf of the DoD, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.  ECF No. 1-1 (Notice of Removal) ¶ 26.  As noted, until recently those specifications expressly required MilSpec AFFF to contain the very chemicals that Plaintiff cites as the cause of its injuries, and even today those chemicals are effectively required in order to meet other requirements of the specification.  Further, MilSpec AFFF products are subject to various tests by the Navy before and after being approved for use by the military and for inclusion on the Qualified Product List ("QPL") maintained by the DoD.  *Id.* ¶¶ 18, 26.  Based on these facts, *every* court to address the issue has held that Tyco and other AFFF manufacturers have acted under federal authority in manufacturing and supplying MilSpec AFFF.  *Nessel*, 2021 WL 744683, at *3; *AFFF I*, 2019 WL 2807266, at *3; *AFFF II* at 3-54 (MilSpec AFFF supplied to Part 139 airports); *AFFF III* at 4 (MilSpec AFFF supplied to Part 139 airport); *Ayo*, 2018 WL 4781145, at *7-9.

### b.  Tyco's Manufacture of MilSpec AFFF Is Related to Plaintiff's Claims.

The second requirement for removal under Section 1442(a)(1) is that the removing defendant has been sued "for or relating to any act under color of [federal] office."  *Ruppel*, 701 F.3d at 1180.  This is sometimes termed the "nexus" requirement.  The "hurdle erected by this requirement is quite low."  *Isaacson*, 517 F.3d at 137.

That requirement is met here because Plaintiff's claims arise in part from Tyco's production and sale of MilSpec AFFF manufactured under federal direction.  On its face, the Complaint alleges that some of Plaintiff's injuries have arisen at least in part from the use of AFFF at several military facilities and Part 139 civilian airports.  ECF No. 1-1 (Complaint) ¶¶ 144.  Those facilities

are required to use—and have used—MilSpec AFFF, including such AFFF manufactured by Tyco. ECF No. 1 (Notice of Removal) ¶¶ 17-22. And Plaintiff expressly alleges that its injuries at those sites have been caused by the inclusion in AFFF of chemicals—PFAS—that Navy specifications require to be in MilSpec AFFF. ECF No. 1-1 (Complaint) ¶¶ 13, 30-31. The nexus between Plaintiff's claims and Tyco's acts under federal direction could scarcely be tighter. Where a plaintiff alleges harm from AFFF used at a military facility or Part 139 airport, the "for or relating to" requirement is satisfied. *See AFFF I*, 2019 WL 2807266, at *3; *AFFF II* at 5; *Ayo*, 2018 WL 4781145, at *2, 9.

### c. Tyco Has a Colorable Government Contractor Defense as to Sites Allegedly Affected by MilSpec AFFF.

Under the federal government contractor defense, a defendant is not liable for alleged injuries from a product "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. At the removal stage, the defendant's burden is only to show that the defense is "colorable." *Ruppel*, 701 F.3d at 1182. The inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014) (citing *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 n. 12 (2006)). "Proof of a 'colorable' federal defense thus does not require the defendant to 'win his case before he can have it removed' nor even establish that the defense is 'clearly sustainable.'" *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 209–10 (4th Cir. 2016) (quoting *Willingham*, 395 U.S. at 407).

The Notice of Removal alleges facts showing that Tyco colorably satisfies each element of the defense as to sites allegedly affected by the use of MilSpec AFFF, *i.e.*, military facilities and Part 139 airports.  The United States, through the Navy, has exercised its discretion to approve reasonably precise specifications for MilSpec AFFF, including the requirement that the product contain PFAS.  ECF No. 1-1 (Notice of Removal) ¶¶ 18-19.  Tyco's MilSpec AFFF conformed to those specifications, as evidenced by the fact that, after testing, the Navy placed the company's AFFF products on the QPL.  *Id.* ¶ 26, 33.  And the United States at all times has had at least as much knowledge as Tyco about the alleged harms of PFAS.  *Id.* ¶¶ 34-35.  Plaintiff's claims seek to do precisely what the government contractor defense prohibits:  "second-guess" the discretionary judgments of government officials with respect to the design of military products—here, the judgment that MilSpec AFFF must contain PFAS.  *See Boyle*, 487 U.S. at 511.  Every court to address the issue has held that Tyco's allegations are sufficient to show that it has a colorable government contractor defense.  *Nessel*, 2021 WL 744683, at *4; *AFFF I*, 2019 WL 2807266, at *3; *AFFF II* at 4; *AFFF III* at 4-5; *Ayo*, 2018 WL 4781145, at *9-14.

### 2.   Independently and Alternatively, Removal Is Proper Under the Federal Question Statute.

A fully sufficient alternative ground for removal is that Plaintiff's claims arise in part from activity at Fort McCoy, which is a federal enclave and therefore subject to exclusive federal jurisdiction.

The Constitution confers on Congress the power "[t]o exercise exclusive Legislation" over the District of Columbia "and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."  U.S. Const. art. I, § 8, cl. 17.  "It long has been settled that where lands for such a purpose are purchased by the United States with the

consent of the State legislature, the jurisdiction theretofore residing in the state passes, in virtue of the constitutional provision, to the United States, thereby making the jurisdiction of the latter the sole jurisdiction." *Surplus Trading Co. v. Cook*, 281 U.S. 647, 652 (1930). Lands made subject to exclusive federal jurisdiction in this manner are termed federal enclaves.

Because the United States exercises sole lawmaking authority over a federal enclave, the law governing that enclave is by definition federal law, although such law may (and often does) incorporate state-law rules of decision. *See, e.g.*, *United States v. Williams*, 552 F.3d 592, 593 (7th Cir. 2009) (involving act at Fort McCoy criminalized by Wisconsin law); *Macomber v. Bose*, 401 F.2d 545, 546 (9th Cir. 1968); *Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952). Thus, actions involving claims that arise on federal enclaves are subject to federal-question jurisdiction under 28 U.S.C. § 1331 (in this setting often termed "federal enclave jurisdiction"). *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006); *Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Stokes v. Adair*, 265 F.2d 662, 666 (4th Cir. 1959). It follows that such actions, if originally filed in state court, may be removed to federal court under 28 U.S.C. § 1441(a). *See, e.g.*, *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1236 (10th Cir. 2012); *Federico v. Lincoln Military Housing*, 901 F. Supp. 2d 654, 664 (E.D. Va. 2012).

A tort claim "arises" on a federal enclave if the activity giving rise to the claimed injury occurs within the boundaries of the enclave. *See, e.g.*, *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998) ("actions which arise from incidents occurring in federal enclaves"); *Stokes*, 265 F.2d at 666 ("injuries inflicted on a federal reservation"); *Federico*, 901 F. Supp. 2d at 664 ("the events alleged in the complaint occurred on a federal enclave"); *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1328-29 (N.D. Ala. 2010) ("[t]he fact that the injury occurred there [on the federal enclave] is sufficient.").

Fort McCoy is, and has long been, a federal enclave. *See, e.g.*, *United States v. Devenport*, 131 F.3d 604 (7th Cir. 1997); *see also* Wis. Stat. § 1.02(2) (statute, enacted in 1985, confirming that the State has consented to the United States' acquisition of the tracts comprising Fort McCoy and that the United States has exclusive jurisdiction over that property). As noted above, the Complaint alleges that Plaintiff's injuries arise at least in part from the use and release of AFFF at Fort McCoy.[6] ECF No. 1-1 (Complaint) ¶ 144(b). Because the claims that Plaintiff asserts arise from activity on a federal enclave, the presence of those claims supports jurisdiction under Section 1331 just as if Plaintiff had invoked a federal statute as the basis of its claims. In a materially identical situation, the MDL court upheld removal of an action filed by the State of New York where the claims arose in part from the use of AFFF at a military facility that was, at the time, a federal enclave. *AFFF I*, 2019 WL 2807266, at *3-4.

**B. The MDL Court Has Addressed These Jurisdictional Issues.**

As the preceding discussion makes clear, in the MDL Judge Gergel has already ruled on the validity of the jurisdictional bases that Tyco relies on here, upholding federal jurisdiction in each instance. In addition, over the past three-plus years, Tyco and other Defendants have removed dozens of cases—which are now part of the MDL—under the federal officer removal statute. It is still open to the plaintiffs in most of those cases to move for remand before Judge Gergel, although Tyco believes such motions would lack merit. In short, the MDL court has already addressed the propriety of removal in these circumstances, and it may be called upon to do so again in the future.

---

[6] A December 2020 environmental assessment commissioned by the Army Corps of Engineers identified several locations at Fort McCoy where the release of AFFF is believed to be responsible for the presence of PFAS in soil and groundwater. *See* Arcadis, Preliminary Assessment and Site Inspection of Per- and Polyfluoroalkyl Substances, Fort McCoy, Wisconsin (Dec. 2020), available at *https://aec.army.mil/application/files/9616/5106/2720/PFAS_PA_SI_McCoy.pdf*.

Against this background, Plaintiff faces substantial difficulties in arguing for remand. It will have to somehow distinguish this case from the multiple AFFF cases that have already upheld removal jurisdiction and/or argue that the decisions in those cases should be ignored. Plaintiff may be entitled to try, but if it insists on doing so, it should be required to await the JPML's decision on transfer and present its arguments to Judge Gergel in the likely event that the JPML orders transfer.

### C. The Balance of Interests Favors a Stay.

Granting a stay in this case will conserve judicial resources, avoid duplicative litigation, and ensure uniform adjudication. Where transfer to an MDL is likely, "[j]udicial economy weighs heavily in favor of granting a stay. A stay will allow consistent pretrial rulings and conserve the resources of the parties, counsel, and the judiciary. Absent a stay, these entities likely will be forced to engage in duplicative efforts in a number of fora." *Miller v. Bayer HealthCare Pharm. Inc.*, No. 4:15-cv-1401, 2015 WL 5572801, at *1 (E.D. Mo. Sept. 22, 2015). For this reason, "a majority of courts have concluded that it is often appropriate to stay preliminary pretrial proceedings while a motion to transfer and consolidate is pending with the MDL Panel because of the judicial resources that are conserved." *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1362 (C.D. Cal. 1997); *accord* 15 Wright, Miller, & Cooper, Federal Practice And Procedure § 3866.1 (3d ed. 2007) ("district courts often will exercise their discretionary power to stay the proceedings before them with regard to a variety of matters pending a decision by the Panel regarding the transfer of a case, especially when such a stay would further the policies of judicial economy, efficiency, and consistency that are deeply embedded in the federal multidistrict litigation statute"); *see also* David F. Herr, Multidistrict Litigation Manual, § 3:15 (2009) ("District courts have . . . readily stayed proceedings pending a Panel decision"); Manual for Complex Litigation,

Fourth, § 22.35 (2004) ("A stay pending the Panel's decision can increase efficiency and consistency, particularly when the transferor court believes that a transfer order is likely and when the pending motions raise issues likely to be raised in other cases as well").

The explicit purpose of the multidistrict litigation mechanism is to coordinate the pretrial management of actions sharing common factual issues in a "just and efficient" manner. 28 U.S.C. § 1407(a). Allowing an action that overlaps with similar cases in an MDL to proceed while the JPML makes a determination on transfer would undermine that purpose. *See, e.g.*, *Rivers*, 980 F. Supp. at 1360 (absent a stay, "this Court will have needlessly expended its energies familiarizing itself with the intricacies of a case that would be heard by another judge"). Where a case is likely to be transferred to an MDL, there are obvious efficiencies in allowing the transfer process to play out before the JPML and, if transfer occurs, allowing the MDL court to decide all pretrial matters in that case and other cases that involve common questions. Having pretrial matters be decided before transfer by the various federal courts to which the cases were originally removed is inefficient and creates the risk of inconsistent determinations.

The fact that Plaintiff challenges this Court's subject-matter jurisdiction is no barrier to a stay. On the contrary, given the nature of the challenge, it is a factor that weighs strongly *in favor* of a stay. The MDL is a mature proceeding, and over the past three-plus years Judge Gergel has devoted enormous energy to numerous recurring issues, including issues of federal officer removal and federal enclave jurisdiction as applied to the manufacture and use of AFFF. Plaintiff's motion to remand will implicate issues that have been, and will continue in other cases to be, before the MDL Court. Apart from deciding multiple motions to remand involving the grounds of removal at issue here, Judge Gergel is currently considering Defendants' motion for summary judgment on the government contractor defense, which is closely bound up with questions under the federal

officer removal statute.  Under these circumstances, it would be wasteful for this Court or any other court to attempt to duplicate that effort.  *See, e.g.*, *Bad River Band*, 2019 WL 252026, at *2 ("the interests of judicial economy weigh heavily in favor of a stay" where the case falls within the scope of an MDL and cases in the MDL raise the same jurisdictional issue); *Lac Courte Oreilles Band*, 2018 WL 2390120, at *2 (same).  Staying this action pending its transfer to the AFFF MDL will conserve this Court's resources and pretrial management efforts.

Considerations of fairness also favor a stay.  Plaintiff will suffer no real prejudice from the brief delay occasioned by a stay.  Plaintiff does not seek emergency relief—only damages, costs, and related declaratory and equitable relief.  This lawsuit presents a host of complex historical and scientific issues.  It will take multiple years to litigate no matter where that occurs, and the requested stay will not materially add to the lifespan of the case.  Under the schedule set by the JPML, briefing of Plaintiff's motion to vacate the CTO will be completed by late September, and the JPML is likely to decide the transfer issue by early December. Thus, the delay from staying the case pending the JPML's transfer decision will not be significant in the context of this litigation.  *See Tibbetts*, 2022 WL 252685 at *2-3 (E.D. La. Jan. 27, 2022) (deeming several month stay to await MDL Panel's decision on contested transfer to AFFF MDL as "relatively brief"). Moreover, MDLs by their very nature *benefit* parties in Plaintiff's position.  In the MDL, discovery as to the Defendants has been ongoing for several years.  Once this matter joins the MDL, Plaintiff will have access to a wealth of discovery material that Defendants have already produced, which ought to substantially expedite the development of this case.

Against the non-existent prejudice to Plaintiff must be balanced the concrete prejudice that Defendants will suffer if a stay is not granted.  A key premise of the MDL mechanism is that it is unfairly burdensome to defendants confronted with a mass of similar cases in different

jurisdictions to be forced to fight a multi-front war, with the attendant risks of being subjected to inconsistent rulings and obligations on common issues. MDLs are designed to avoid such burdens, and plaintiffs should not be permitted to undermine the purpose of the MDL process simply by trying to outrun JPML transfer decisions with threshold motions that seek rulings before the JPML acts. Thus, courts recognize that the potential burdens to defendants of engaging in duplicative litigation weigh in favor of a stay pending the outcome of the JPML transfer process. *See, e.g.*, *See Bad River Band*, 2019 WL 252026, at *2; *Lac Courte Oreilles Band*, 2018 WL 2390120, at *2.

Accordingly, the balance of interests here supports granting the requested stay. *See, e.g.*, *Marathon Petroleum*, 2022 WL 821667, at *2 ("The efficiency of staying the proceedings until the transfer issue is resolved is especially apparent here, where, as Defendants note, the district court in South Carolina has overseen numerous cases in the multidistrict litigation for three years and, in that time, has determined a range of issues, including motions to remand.); *Tibbetts*, 2022 WL 252685, at *3 ("[T]he Court is persuaded that the balance of interests strongly favors a stay: the stay is likely to be relatively brief; it will not prejudice the plaintiff . . . ; it will avoid prejudice to the defendants; and it will conserve judicial resources and ensure consistent rulings on common issues—issues that have been and are being resolved by the MDL Panel.").

## IV.   <u>CONCLUSION</u>

For the reasons stated, Tyco respectfully requests the Court to stay all proceedings in this case pending its almost certain transfer to the AFFF MDL.

Dated:  August 18, 2022

<u>/s/ Bryan T. Mette</u>
Bryan T. Mette, WI Bar No. 1125800
Foley & Lardner LLP
150 E. Gilman St., Suite 5000
Madison, WI 53703
Phone: (608) 258-4292

Fax: (608) 258-4258
bmette@foley.com

Matthew D. Krueger, WI Bar No. 1096923
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202
Phone: (414) 271-2400
Facsimile: (414) 297-4900
mkrueger@foley.com

*Attorneys for Defendants Tyco Fire Products, LP
and Chemguard, Inc.*